# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE

<table>
<tr><td>STATE OF TENNESSEE,</td><td>)</td><td><strong>FOR PUBLICATION</strong></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>APPELLEE,</td><td>)</td><td><strong>Filed</strong>: <strong>September 21, 1998</strong></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>HUMPHREYS COUNTY</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Hon. Allen W. Wallace</td></tr>
<tr><td>WILLIAM E. HALL AND</td><td>)</td><td></td></tr>
<tr><td>DERRICK D. QUINTERO,</td><td>)</td><td>No. 01S01-9703-CC-00068</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>APPELLANT.</td><td>)</td><td></td></tr>
</table>

FILED

September 21, 1998

Cecil W. Crowson
Appellate Court Clerk

**FOR APPELLANT HALL:**

Jennifer Davis Roberts
Dickson, Tennessee

and

Reese Bagwell
Clarksville, Tennessee

**FOR APPELLANT QUINTERO:**

Shipp R. Weems
District Public Defender
Charlotte, Tennessee

and

Steve Stack
Assistant Public Defender
Charlotte, Tennessee

**FOR APPELLEE:**

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Darian B. Taylor
Assistant Attorney General
Nashville, Tennessee

Dan M. Alsobrooks
District Attorney General

J. Kenneth Atkins
Special Prosecutor
Charlotte, Tennessee

James W. Kirby
Assistant District Attorney General
Charlotte, Tennessee

# O P I N I O N

AFFIRMED.                                                                              DROWOTA, J.

In this capital case, the defendants, William Eugene Hall, Jr., and Derrick Desmond Quintero, were convicted by a jury of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary. For their convictions of larceny and burglary, the defendants each were sentenced to eighty years incarceration, which sentences were ordered to run consecutively to the life sentences imposed for their conviction of the first degree murder of Buford Vester. With respect to the first degree murder of Myrtle Vester, the jury found the proof established the following five aggravating circumstances: (1) the defendants were previously convicted of one or more felonies involving the use or threat of violence, Tenn. Code Ann. § 39-2-203(i)(2) (1982); (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5) (1982); (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of themselves or others, Tenn. Code Ann. § 39-2-203(i)(6) (1982); (4) the murder was committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit, or fleeing after committing or attempting to commit, any first-degree murder, arson, rape, robbery, burglary, larceny, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, Tenn Code Ann. § 39-2-203(i)(7) (1982); and (5) the murder was committed by the appellants while they were in lawful custody or in a place of lawful confinement or during their escape from lawful custody or from a place of lawful confinement, Tenn. Code Ann. § 39-2-203(i)(8) (1982).[1] Finding that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances, the jury sentenced the defendants to death by electrocution for the murder of Myrtle Vester.

---

[1]These aggravating circumstances are now codified at Tenn. Code Ann. §39-13-204(i)(2); and (5)-(8) (1997 Repl.).

On direct appeal to the Tennessee Court of Criminal Appeals, the defendants challenged both their convictions and their sentences. The appellate court found that the evidence did not support dual larceny convictions and ordered that the petit larceny convictions be merged with the grand larceny convictions. The intermediate appellate court affirmed the defendants' convictions of first degree murder and sentences of life imprisonment and death by electrocution, finding the jury's erroneous reliance upon two inapplicable aggravating circumstances, (i)(6) and (i)(7), harmless beyond a reasonable doubt.

Pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.),[2] the case was docketed in this Court. The defendants have raised numerous issues in this Court. After carefully examining the law, the record, and the thorough opinion of the Court of Criminal Appeals, we have determined that none of the assignments of error require reversal. We have also concluded that the Court of Criminal Appeals erred in finding the evidence insufficient to support the (i)(6) aggravating circumstance, and accordingly reinstate the jury's finding of that circumstance. The evidence is sufficient to support the jury's findings as to the remaining aggravating circumstances and the mitigating circumstances. Finally we hold that the sentences of death are not arbitrary or disproportionate to the sentences imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendants' convictions and sentences of death by electrocution is affirmed as modified.

---

[2]"Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

## BACKGROUND

The proof introduced by the State during the guilt phase of the trial demonstrated that Myrtle and Buford Vester were murdered in their home in the Leatherwood community of Stewart County, which is situated on Kentucky Lake and in close proximity to the Tennessee-Kentucky border. The Vesters were murdered sometime after their son left their home at 6:00 p.m. on Sunday, June 19, 1988 and sometime before their bodies were discovered by their neighbor around 10:00 a.m. on Wednesday, June 22, 1988.

Along with six other men, the defendants in this appeal, Derrick Quintero and William Hall, escaped from the Kentucky State Penitentiary at Eddyville during the early morning hours of June 16, 1988. Three of the escapees[3] were apprehended in the vicinity of the prison on or before June 18, 1988. However, the other five escapees, including Quintero, Hall, James Blanton, Joseph Montgomery, and Ronnie Hudson left the area in a 1966 Chevrolet pick-up truck[4] which they stole from Curtis Rogers who lived about one-half of a mile from the prison facility.

The Stewart County Sheriff's department was notified at 2:30 a.m. on June 16 that inmates had escaped from the penitentiary at Eddyville. After news of the escape had been broadcast to the public, the Sheriff's department received a telephone call from Zachery Pallay, a resident of the Leatherwood community, warning that Quintero was familiar with the area and would probably seek refuge there. The Sheriff's department's also received several reports of suspicious individuals in the Leatherwood area including a report of three men attempting to flag down a car. However, when a rash of burglaries broke out in

---

[3]Bobby Sherman, Leo Sperling, and Floyd Cook.

[4]The truck was located seventeen months after the escape in a wooded area of Stewart County, Tennessee. It had been completely covered with branches.

the Leatherwood community, the Sheriff's department became convinced that the escapees were in the area. The burglarized residences in Stewart County were owned by Jim McMinn, Neal Foster, Essie Settles, Alfred Cherry, Thomas Harris, and John and Virginia Crawford.

Though it is not possible to determine from the record the precise order in which the burglaries occurred, the proof demonstrates that five of the six burglaries occurred before 1:00 p.m. on Sunday, June 19, 1988.

The first burglary was reported and occurred on June 18, 1988. That day, Jim McMinn of Clarksville, Tennessee, arrived at his cabin in the Leatherwood area at approximately noon. He left the cabin to go fishing in his boat at around 1:00 p.m. Upon returning to the cabin at 2:30 or 3:00 p.m., McMinn noticed a box of shotgun shells lying on the floor and discovered that his loaded .22 caliber pistol was missing from the bedroom. The telephone in his cabin had been removed from the wall, and the outside portion of the phone line also had been severed. McMinn went to his truck and discovered that the windows had been rolled up and the ignition destroyed with his ax. The telephone from McMinn's cabin was in the bed of the truck.

Following the report of the McMinn burglary on June 18, the Sheriff's Department initiated an intensive search of the area, utilizing helicopters, four-wheel drive vehicles, and tracking dogs. At one point law enforcement officers chased some individuals on foot through the woods, but they were not able to overtake the persons suspected to be the escapees.

At some point, perhaps during that chase, Hudson and Montgomery became separated from the defendants and Blanton. Hudson and Montgomery left the Leatherwood community and drove to Lebanon, Kentucky in a 1982

White Ford Fairmont they stole from Essie Settles, a resident of the Standing Rock Community, which is approximately six highway miles from the Leatherwood community. Montgomery's fingerprint was found on Settles' garage door. Hudson's fingerprint was found inside the car when it was later recovered. Settles had seen the car in her garage around 10:00 a.m. on Saturday morning and discovered that it was missing at approximately 1:30 p.m. on Sunday afternoon. The proof demonstrated that the car was stolen sometime Saturday night or before daylight on Sunday morning. Burned matches were found inside the garage indicating that it had been dark when the theft occurred. In addition, when she watered her flowers around 8:00 a.m. on Sunday morning, Settles noticed that someone had removed the hose from the outside faucet during the night. Settles stated that the hose had been connected when she had used it on Saturday evening around 6:00 p.m.

Hudson and Montgomery arrived at Hudson's brother's apartment in Lebanon, Kentucky on Sunday, June 19, at approximately 1:00 p.m. They were driving a white car with Tennessee license plates, which witnesses identified at trial as the vehicle which had been stolen from Settles. Hudson's brother and a friend accompanied the two escapees to a secluded area on the river where Hudson and Montgomery hid the stolen car among the weeds. Around 6:00 or 6:30 p.m., Hudson's brother left the two escapees in the company of Hudson's mother and sister. The next day, Hudson's sister, her two children, and Martha Grover picked up the two escapees and transported them to Grover's apartment where they stayed until early evening on Tuesday, June 21. The following day, Wednesday, June 22, Kentucky authorities apprehended both Hudson and Montgomery near the location where Settles' car had been hidden. Shots were exchanged prior to the convicts' apprehension. Hudson and Montgomery had in their possession McMinn's .22 caliber pistol and a .22 caliber pistol which had been stolen from another resident of the Leatherwood community, Neal Foster.

Two live rounds were recovered from Foster's pistol, and four spent shells were recovered in the area. While this proof demonstrated that Hudson and Montgomery were some two hundred miles away in Lebanon, Kentucky when the Vesters were murdered in Stewart County, Tennessee, it also showed that the McMinn and Foster burglaries occurred before 1:00 p.m. on June 19.

The Cherry and Harris burglaries were discovered around 3:00 or 4:00 p.m. on June 19, 1988 by Alfred Cherry. Cherry's trailer was located approximately one-half of a mile from the murder victims' residence. The inside of the trailer was in disarray. A bed was unmade and wet towels were in the bathroom. The refrigerator light switch had been taped down to prohibit the light from operating when the refrigerator door was opened. The hot water tank had been set on high.

Missing from the trailer were two bedspreads, a green thermal blanket, a sleeping bag, a portable radio, approximately fifteen cassette tapes, a rechargeable flashlight, a small handsaw, six knives, coffee mugs, various canned goods, a gallon of homemade wine, two bottles of bourbon, a six-pack of beer, a toothbrush, underwear, and two paperweights bearing the Cumberland Electric logo.[5]

Cherry did not have a telephone in his trailer. Upon discovering the burglary, he went next door to call the police on the telephone in the trailer owned by his brother-in-law, Thomas Harris. Cherry discovered that Harris' trailer had also been burglarized. The trailer had been ransacked. The refrigerator light had been removed. The sink was full of dirty dishes, and food was in a skillet on the stove. Wet towels and sheets were strewn about and

---

[5]These paperweights were found seventeen months later in the bed of the 1966 Chevrolet truck which the escapees had stolen near Eddyville and driven to the Leatherwood community.

cigarette burns were all over the floors.  Stolen from the trailer were all the canned food items, two quilts, silverware, butcher knives, towels, toilet articles, and a fishing tackle.

When Harris later received his telephone bill, he realized that several unauthorized long distance telephone calls had been placed from his trailer. Three of the unauthorized calls had been placed to a number in Springtown, Texas.  These calls occurred on Sunday, June 19, at 3:51 a.m., 8:55 a.m. and 9:19 a.m.  Two additional unauthorized calls were placed to a telephone number in Hopewell, Pennsylvania, at 4:00 a.m. and 9:19 a.m.  The telephone number called in Springtown, Texas, was listed to Bryan Quintero, who is a brother of Derrick Quintero.  The telephone number called in Hopewell, Pennsylvania, was listed to a Barbara Vasser, William Hall's girlfriend.

At trial, Vasser testified that Hall told her during their first telephone conversation after the escape that his parole had been denied.  Hall would not reveal to Vasser his and Quintero's location, but told Vasser that there were helicopters in the area searching for the escapees and that he and Quintero had been separated from Hudson and Montgomery.

Two knives taken from the Cherry trailer were found at Neal Foster's residence indicating that it was burglarized sometime after the Cherry and Harris trailers.  Again, however, the burglary occurred sometime before 1:00 p.m on June 19, because Montgomery and Hudson had in their possession a gun which had been stolen from the Foster residence when they were apprehended.

However, Foster did not discover the burglary until Tuesday, June 21. The residence had been ransacked.  Food was on a kitchen counter, deer steaks were in the microwave, and his binoculars were sitting on a kitchen

counter. A green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol were on the floor of the living room. The hallway floor was littered with a Diet Pepsi can, a tin can of old coins, a notebook that once had old coins in it, some socks, a laundry basket with clothes that did not belong to him, and a pair of white tennis shoes that did not belong to him. Towels were strewn around the house. He found in his bathroom a pocket knife, towels, a pair of socks, a .22 caliber shell box, and a 20 gauge shotgun shell. The beds were unmade and had items spread on top of them. The master bedroom dresser drawers were open, and items were scattered all around the bedroom, including two walkie-talkies, a hacksaw, and a 12 gauge shotgun barrel. In the front bedroom, he found several hats, matchbooks, a jar of marshmallow cream, a box of graham crackers, and a small drinking glass.

In a walk-in closet in the residence Foster had kept a .22 caliber pistol, a Glenfield .22 caliber rifle, a Marlin .30-30 caliber lever action rifle, a 20 gauge shotgun, a single shot shotgun, and a Remington Model 1100, 12 gauge shotgun. Following the burglary, he found the 12 gauge shotgun lying on his bed. Someone had attempted to saw off the barrel and had rendered the gun inoperable. The 20 gauge shotgun was missing from his house, but a portion of the gun's barrel had been sawed off and left in Foster's bedroom. Also missing after the burglary were his .30-30 lever action rifle and ammunition for various weapons, including .30-30 accelerator rifle bullets, .30-30 caliber rifle shells, 20 gauge shotgun shells, and 12 gauge shotgun shells. In addition to the ammunition, several coins which Foster had collected, including silver dollars, were taken in the burglary.

The authorities found several latent prints at the Foster residence, and identified some of them as belonging to the escapees. A latent left thumb print matching that of Quintero was found on a full box of Federal 12 gauge shotgun

shells. A latent right ring fingerprint matching that of Quintero was found on another Federal 12 gauge shotgun shell box. A right middle finger and a right index fingerprint matching Blanton's print was found on a Federal field load 12 gauge shotgun shell box. A right palm print matching that of Quintero was lifted from one of the gun barrels. A latent right ring fingerprint matching that of Hall was lifted from a Diet Pepsi can.

Though the Crawford burglary was not discovered until after the Vesters' bodies had been discovered, a glove taken from the Crawford residence was found at the home of the murder victims, indicating that the burglary actually occurred before the murder. The Crawford residence was less than a quarter of a mile from the Vesters' home. John and Virginia Crawford had left their trailer, clean and orderly, around 2:00 p.m. on Sunday, June, 19. Following the burglary, they found their kitchen ransacked. Canned foods, crackers, and candy bars from the cabinet and refrigerator had been eaten. Prints were lifted from several items in the trailer. A latent left thumb print matching that of Hall was found on the bottom of a can of ham. A latent right index fingerprint left by Blanton was lifted from a Butterfinger candy wrapper found inside the refrigerator. The Crawfords identified two gloves found at the trailer, one white jersey and one brown jersey, as belonging to Mrs. Crawford. A patch on one of the gloves had been sewn on by Mrs. Crawford. Mr. Crawford testified that a flashlight had also been taken from the trailer. One of the gloves found at the Crawfords' trailer matched a glove found outside the Vesters' front bedroom window. A fiber analysis of the two gloves indicated that they were likely originally sold together as a pair.

With respect to the timing of the murder, the proof showed that late on Monday evening, June 20, John Corlew and Arthur Jenkins arrived at the Leatherwood boat dock, launched their boat, and night fished in the

Leatherwood Bay. Between 11:00 p.m. and 12:00 a.m. they heard five gunshots emanating from the direction of the Vesters' residence. Corlew testified that he first heard two gunshots that were fairly clear, and after a pause, he heard two additional shots, another pause, and one final shot. Corlew testified that the first two shots and the second two shots sounded as if they were from different weapons. Mr. Jenkins testified that the two initial shots sounded like repercussions from a pistol. Both Jenkins and Corlew heard a total of five gunshots.

The victims, Buford and Myrtle Vester, were last seen alive around 6:00 p.m. on Sunday June 19 by their son Wayne. He, along with his twelve-year-old son, had arrived at his parents' home for a weekend visit on the evening of Friday, June 17. He had picked up groceries for his parents including Pepsi colas, lunch meat, bread, and milk. Wayne Vester left his parents home on Sunday, June 19, at approximately 6:00 p.m. At that time, the Vesters were alive and well. Wayne attempted, unsuccessfully, to reach his parents by telephone once on Monday, June 20, and twice on Tuesday, June 21. Concerned, Wayne called their neighbor, Howard Allor, who lived approximately one quarter of a mile from the Vesters, but Allor had not seen them since the preceding Friday morning. When Wayne was still unable to reach his parents on June 22, he again called Allor and asked him to check on them. Allor drove to the Vesters' residence and discovered their dead bodies. He attempted to telephone the Sheriff from their residence, but the telephone was not functioning, so he returned home and reported the murders to the authorities.

David Hicks, Sheriff of Stewart County, was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation ("T.B.I.") conducted the primary investigation of the crime scene. The only entrance to the Vester residence was a screen

door located at the side of the house opposite to the victims' bedrooms. The screen door had not been damaged. However, the front window was open, and the screen from the front window was lying on the ground near Myrtle Vester's bedroom window which was located at the back of the house. Underneath the front window was a concrete block which apparently had been taken from the front of a shed located at the back of the house. A cloth glove which matched a glove found at the Crawfords' residence was found on the ground beside the concrete block. An unopened Pepsi cola can lay next to the walkway to the screen door of the house. The packages of Pepsi cola that Wayne Vester had brought his parents were missing from the porch. The Vesters' maroon 1985 Pontiac Bonneville also was missing. The wires to the telephone connection box outside the Vesters' residence had been damaged and the line was dead. A live 20 gauge Federal shotgun shell with number 6 bird shot was found lying near the electrical box. A spent 20 gauge number 4 shot Federal shotgun shell casing was found near the shed approximately 18 feet from Mr. Vester's back bedroom window.

The windows to the victims' bedrooms were located along the back of the house. Buford Vester's bedroom window frame was visibly bent. The screen covering the window had a hole in it which indicated that Mr. Vester was shot at least once from outside the house. Some the glass louvers were broken, and shards of glass were found lying on the bed. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back, and blood was on both the pillow and the bed. Number 4 and 5 bird shot pellets were retrieved from Mr. Vester's room. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. A plastic shot sleeve, one shot shell, a plastic shot wad, and several shot pellets, all either number 4 or 5 bird shot, were recovered from Mr. Vester's body.

The victims were in separate bedrooms joined by a bathroom. Myrtle Vester's body was found lying in a pool of dried blood on the floor of her bedroom next to the bathroom. Mrs. Vester had been shot three times, once with a 20 gauge shotgun, once with a high-powered rifle, and once again with either a shotgun or a high-powered rifle. She also had been stabbed thirteen times. A copper-jacketed bullet was recovered from her body. Blood was found on Mrs. Vester's bed, and a considerable amount of blood was found on the bathroom floor. Blood was splattered on both the bathtub and the commode, and the bottoms of Mrs. Vester's feet also were covered in blood. The screen covering Mrs. Vester's bedroom window also had a hole in it, indicating that at least one shot had been fired from outside. The open and unbroken condition of the glass louvers indicated that the high-powered rifle or shotgun had been near the window when it was fired. Shot was sprayed all over the house, especially the kitchen. All of the shot pellets found in the house were either number 4 or 5.

On the victims' sofa authorities found a portion of *The Tennessean*, dated Monday, June 20, 1988. The local mail carrier testified that the victims did not receive *The Tennessean* by mail. A live 20 gauge shotgun shell with number 7.5 shot was found lying on the floor in the front bedroom next to a ransacked jewelry box.

Dr. Charles Harlan, the medical examiner, performed an autopsy on each victim and testified that the Vesters had died within two hours of consuming dinner. He stated that the victims had been shot a total of five times, and a minimum of three different weapons had been used to murder them.

Mrs. Vester had sustained three gunshot wounds. Gunshot wound A, located at the right portion of Mrs. Vester's chest just below her collarbone, measured approximately a quarter of an inch and was basically round in shape.

This wound resulted when a copper jacketed bullet entered Mrs. Vester's body and lodged in her left arm. Wound B resulted from a shotgun blast and was located in the upper arm. This wound measured 3.4 inches by 1.8 inches, was jagged, with an irregular edge, and had multiple associated tangential abrasions. Wound C resulted from either a high-velocity rifle or shotgun. This gunshot blast had severed the two bones in Mrs. Vester's right forearm, leaving her hand and wrist attached to her body by a piece of tissue, consisting of only skin, muscle, and fat. Dr. Harlan could not determine the order in which these three gunshot wounds were inflicted.

Mrs. Vester also had sustained thirteen stab wounds, one to the middle of her back and twelve to her head, neck, and shoulder region. A majority of the stab wounds were inflicted to the left side of her head and neck. Dr. Harlan surmised that the puncture wounds were made by a squared object with a sharp edge, such as a kitchen or hunting knife. Two of the stab wounds severed her right and left common carotid arteries. The right carotid artery was 90 percent severed, and the left was 10 percent severed. Dr. Harlan testified that either the injuries to her carotid arteries or the gunshot injury to her right forearm would have been fatal. Dr. Harlan determined that Mrs. Vester could have survived the brutal attack for up to 15 minutes.

Mr. Vester had sustained two gunshot wounds. Shotgun wound A was located at the head and neck juncture. The total dispersal pattern of shotgun pellets was 13 inches. Wound A caused significant injury to his left lung, aorta, and pulmonary artery. Shotgun wound B was to Mr. Vester's right breast and caused trauma to his right lung and to his liver. Dr. Harlan recovered shotgun pellets and a shot column from Mr. Vester's chest and abdomen. Dr. Harlan opined that Mr. Vester could have survived from four to twelve minutes after sustaining the gunshot injuries.

On June 21, 1988, around 8 a.m., employees of the Memphis Funeral Home observed three men, in a maroon Pontiac which was later identified as the victims' car, enter the funeral home parking lot and park the car approximately 250 feet from the building. Two employees of the funeral home testified that one man got out of the front seat, took his tank top off, and put on three additional shirts. The two other men also exited the car. None of the witnesses could make a positive identification of the three men. The witnesses testified that all three men were white and about the same height, but two of the men were approximately 180 pounds and had darker hair. They stated that all three men had facial hair. One funeral home employee described the three men as having beards and stated that one had long hair.

The three men remained in the parking lot for approximately five to eight minutes. Then, after one of them took something out of the trunk, the three men walked towards a hospital across the street from the funeral home. One of the men turned, walked back to the car, and appeared to have placed an item back into the car. He then joined the two other men, and then all three walked away. The funeral home employees assumed that the three men were working on a construction project at the hospital. However, when the car had not been removed by Thursday, the funeral home employees contacted the Memphis Police Department.

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the Memphis Funeral Home. The police found a 1985 maroon Pontiac Bonneville in the funeral home's parking lot. The vehicle matched the description of the victims' vehicle. The keys were in the car's ignition. The officers found a sawed-off 20 gauge shotgun containing one live round under the floor mat behind the driver's seat which was later identified as the weapon stolen from the Foster residence, and as the weapon from which a

spent shell found outside the Vesters' residence had been fired. Foster was able to identify the weapon by its serial number; however, the gun also had Foster's full name carved into it. The police also discovered under a floor mat a .30-30 caliber cartridge which matched ammunition that had been taken from the Foster residence. From a crumpled Budweiser beer can which also was found under the back seat police were able to lift three latent prints belonging to Blanton. No other prints were found in the car. The officer noted that the extremely hot temperatures in Memphis at the time the car was found made it difficult to lift intact prints. Other items retrieved from the vehicle included a Ray-O-Vac flashlight, similar to one taken from the Crawford residence, electrical tape, thirteen 20 gauge shotgun shells, three 12-ounce Pepsi colas, one 12-pack of Pepsi colas, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988. The bus station, located in downtown Memphis was approximately one mile from the Memphis Funeral Home. His job was to prevent loitering at the bus station. Mr. Jones sat in a booth and observed people who came inside to determine whether they purchased tickets. Periodically, he would walk around and ask people whether they had tickets or if they were waiting for someone to arrive.

Mr. Jones recalled three men entering the bus station either Tuesday, June 21, or Wednesday, June 22, between 11 a.m. and 1 p.m. Two of the men sat down and watched television. One of the two seated men spoke to a man seated nearby. The third man, who had darker skin and appeared Hispanic, used a telephone. Mr. Jones approached the two seated men and asked them whether they had tickets. A man, whom he identified as Blanton, told him that

they would leave as soon as their friend finished using the telephone. The three men remained in the station five to ten minutes. Later that same day, the Memphis police stopped by the bus station with a photographic line-up of the eight escapees. Jones responded that Blanton and Hall had previously been at the station. Later in the week, Jones spoke with T.B.I. Agent Stout. Jones identified Blanton and Hall from a photographic line-up and made an in-court identification of Hall as one of the men at the bus station.

The Blue Movies West adult bookstore and entertainment center was located across the street from the bus station. Shirley Denise Morrow testified that she worked as a cashier in the bookstore in June of 1988. On Tuesday, June 21, the day before her birthday, three men entered the bookstore around 9:00 or 10:00 a.m. Two of the men were white, and one appeared Mexican. The men traded a few silver dollars and half dollars for tokens. Morrow also purchased some of the silver dollars and half dollars for herself.

The men went to the back of the establishment to watch movies. Darlene Christof, a dancer at the establishment, testified that three "scruffy" men entered her booth on June 21. Two of the men were white, and the other appeared either Hispanic or Mexican. Ms. Christof informed the men that only one was allowed to remain in the booth. Two of the men left. From a photographic line-up, she identified the man who remained in her booth as Quintero. Quintero later gave her several silver dollars and tried to sell her a class ring and a man's wedding band.

The men then returned to the front of the establishment approximately fifteen to twenty minutes later. They attempted to sell Morrow what appeared to be a class ring and a wedding band. Morrow declined and suggested they try a pawn shop. One of the men indicated that they did not have any identification

and offered Morrow fifty dollars if she would allow them to stay in the movie house until their transportation arrived. Morrow declined their offer. Christof then came out from the back of the establishment and pretended to use the telephone. When Christof commented that the three men resembled the escapees from the Kentucky prison, they left. Morrow then contacted the police.

When shown a pre-trial photographic array of the eight escapees, Morrow identified Blanton, Quintero, and Hall as the three men who had visited the bookstore. Morrow turned over to the authorities the six silver dollars she had purchased from the men, and later, Foster identified the coins as those stolen from his residence. Morrow also made an in-court identification of both Quintero and Hall.

Lt. Thomas Pryor, an employee at the Eddyville penitentiary, testified that Quintero had long hair, a moustache, long side burns and a goatee prior to the escape. Lt. Pryor stated that he had never seen Hall with a beard.

Hall was eventually captured in El Paso, Texas. Both Blanton and Quintero were captured in Mexico near El Paso. Barbara Vasser, Hall's girlfriend at the time, testified that her mother called the Pennsylvania State Police after Hall called her for a third time following the escape. Afraid for Hall's safety, Vasser notified the authorities that she had agreed to wire money to him at the Western Union on North Stanton Street in El Paso, Texas. Hall was apprehended by agents of the Federal Bureau of Investigation ("F.B.I.") when he entered the Western Union in El Paso at approximately 2:20 p.m. on July 6, 1988.

On July 10, 1988, Quintero and Blanton were apprehended by Mexican officials at the Santa Fe Hotel in Juarez, located just across the border from El

Paso, Texas, and transported across the international bridge.  F.B.I. agents took custody of both Quintero and Blanton from Mexican officials at a border checkpoint.  Found in Quintero's possession when he was taken into custody was an old wallet bearing an imprint of Neal Foster's driver's license.

Based upon the proof summarized above, the jury convicted both Hall and Quintero of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary.[6]

During the sentencing phase, the State introduced proof that both Quintero and Hall had previous convictions for crimes involving the use or threat of violence.  The State showed that Quintero had been previously convicted of two charges of escape in the first degree and one charge of first degree robbery.  The State also presented proof that Hall had previous convictions for two separate assaults, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice President of the United States of America.

Finally, the State introduced additional photographs and testimony concerning Mrs. Vester's body.  Mrs. Vester was found lying in her bedroom just outside the bathroom.  The State introduced photographs depicting the amount of blood on the bathroom floor and depicting the blood on the bottoms of Mrs. Vester's feet.  The State also introduced a photograph of the front of Mrs. Vester's body to demonstrate to the jury the severity of her injuries and the brutality of the attack.

---

[6]Blanton was separately tried and convicted of first degree murder and sentenced to death.

In mitigation, Quintero presented the testimony of his uncle and aunt, Paul and Josey Quintero, who said that Quintero's parents drank constantly. Quintero's father would stay away from home for long periods of time, and his mother had extramarital affairs. Quintero was hungry for love and affection when he visited his uncle and aunt's home. Paul Quintero testified that Quintero was always eager to seek his approval and never gave him any trouble. Quintero's parents did not discipline their children unless they were angry or drunk, at which time they would beat the children. Testimony also indicated that Quintero never had clothes which properly fit him, and as a result, he was ridiculed by the other children at school.

Paul and Josey Quintero testified that they had attempted to remain in contact with Quintero since learning of the criminal charges. They related that Quintero had obtained his GED in prison and was also enrolled in refrigeration and air conditioning classes. They believed that Quintero had improved himself and would make something productive of his life.

Quintero's cousin, Angela Alva, testified that she and Quintero were at one time very close. She also related how Quintero's parents had abused alcohol, and testified that Quintero had kept company with his older brother, Roderick, who was a bad influence and not a good role model. According to Alva, Quintero was a follower, and Roderick was aggressive.

A video deposition was shown of Helen Mimms Johnson, Quintero's first grade teacher. Johnson testified that Quintero was mischievous but never mean. He was held back a year and had trouble being attentive in class. Quintero was never very clean and always seemed exhausted when he came to school. Johnson never met Quintero's parents because they never attended any parent-teacher meetings.

Angela Holland and her 15-year-old son, Roderick Kent Quintero II, testified. Holland had been married to Quintero's brother for approximately three years. Holland and her son had maintained contact with Quintero and said that he had been influential in helping his nephew stay out of trouble.

In mitigation, William Hall presented the testimony of his older brother, Robert Hall, a prison minister. Robert said that defendant Hall was born in Paducah, Kentucky. Their parents divorced when defendant Hall was two years old. Their father worked on a barge and was gone for extended periods of time. Their mother died of throat cancer when defendant Hall was four, and at that point, Hall went to live with his father and stepmother. Hall's stepmother was at one time addicted to codeine.

According to Robert, the Hall children were not disciplined nor taught right from wrong but were sometimes beaten. Defendant Hall began getting into trouble in grade school. He began drinking alcohol in his pre-teens, and by his early twenties, he had begun abusing drugs. Robert testified that William Hall was a follower, not a leader.

For a time following his parole in 1982, defendant Hall had lived with Robert and his wife Ester in Pennsylvania. He worked with Robert at a tire shop and attended church with Robert and Ester. Robert testified that Hall had turned to God and changed his life. Hall lived with Robert and Ester for eight months. Hall, however, later moved into a trailer near his place of employment and began drinking. Eventually, he returned to Kentucky. The last time Robert and Ester had seen Hall was at his stepmother's funeral in 1987. They speak with him weekly by telephone, however.

Barbara Vasser also testified. She had met Hall when he had lived with his brother in Pennsylvania. Vasser said that Hall's life had changed after he accepted Christ. She and Hall were engaged but never set a date because Vasser was only seventeen years old at the time. Vasser testified that she and Hall were friends off and on between 1982 and 1988. Vasser said she had assisted the authorities because she had been afraid for Hall's safety. Vasser had not remained in contact with Hall after his apprehension.

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt and a clinical psychologist, testified that he prepared a psychological evaluation of Hall in 1991. He testified as to the background information conveyed by Hall during the interview. Hall grew up in Paducah, and his formal education ended after the ninth grade. He later earned his GED while incarcerated. Hall began using drugs and alcohol at age eleven and was addicted to Valium by age fourteen. He was placed in juvenile detention several times and was sent to a youth development center. Hall worked at different jobs while a young adult, but he had mostly been in and out of prison since age seventeen. Hall informed Dr. Anchor that he had experienced two head injuries. He fell off a porch as a baby and was struck in the head with a baseball bat when he was fourteen.

Dr. Anchor testified that Hall was cooperative and responsive during the interview. Hall did not offer any excuses or attempt to blame others. There was no indication of malingering. Moreover, Hall was enthusiastic about his plans to pursue college courses in computers and data processing while incarcerated.

Hall scored a 99 on his I.Q. test which placed him in the 48th percentile. Dr. Anchor testified that although Hall has a reasonable amount of intelligence, he has some difficulty utilizing it. Hall experiences cognitive interference which is frequently seen in people who have habitually abused drugs and alcohol. Dr.

Anchor found Hall's judgment, reasoning, and problem-solving skills to be "unstable." According to Dr. Anchor, that finding is consistent with a history composed of head injuries and substance or polysubstance abuse.

Dr. Anchor concluded that Hall is seriously maladjusted and suffers from organic personality syndrome. Dr. Anchor stated that persons with test profiles similar to Hall's usually have a strong sense of worthlessness and inferiority. Hall feels a deep sense of shame, embarrassment, and humiliation for many of his past actions. Dr. Anchor opined that Hall's psychological maladjustment can be treated effectively with counseling or psychotherapy. At the time of trial, Dr. Anchor stated that Hall did not present a danger either to himself or to others in a prison setting. Dr. Anchor opined that Hall's prognosis was good assuming he abstained from future substance abuse. Dr. Anchor concluded that the prospects for social, educational, and vocational functioning were satisfactory.

In rebuttal, the State presented the testimony of Dr. Samuel Craddock, a clinical psychologist at Middle Tennessee Mental Heath Institute. Dr. Craddock interviewed Hall and disagreed with Dr. Anchor as to the degree of danger Hall poses. Dr. Craddock further testified that he had not seen any data to support a finding that Hall suffered from an organic personality syndrome.

Based upon this proof, the jury found five aggravating circumstances which were not outweighed by the mitigating circumstances and, therefore, sentenced the defendants to death for the murder of Myrtle Vester and to life imprisonment for the murder of Buford Vester.

## MURDER TO PREVENT ARREST

## AGGRAVATING CIRCUMSTANCE (i)(6)

The defendants argue that Tenn. Code Ann. § 39-2-203(i)(6) "is unconstitutionally vague as applied to the facts in this case." The defendants contend and the appellate court found that there was no proof that the defendants killed the victims to prevent arrest or prosecution. The intermediate appellate court determined that (i)(6) was inapplicable because "there was no proof that Mrs. Vester knew the appellants or would have been able to identify them to law enforcement officers."

We reject the narrow construction argued for by the defendants and adopted by the appellate court -- that (i)(6) applies only when a victim knows or can identify a defendant.[7] Aggravating circumstance (i)(6) provides for imposition of the death penalty when:

> [t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

Tenn. Code Ann. § 39-2-203(i)(6) (1982). By its terms, the statute does not limit the aggravating circumstance only to those instances in which a defendant kills a victim because the victim knows or can identify the defendant. For example, a witness to a robbery may be killed while attempting to restrain a masked perpetrator. The mask may effectively prevent the witness from ever identifying the perpetrator; but if the evidence established that the perpetrator killed the witness to flee the crime scene and avoid arrest, application of (i)(6) would be appropriate. While the victim's ability to identify the murderer may be evidence supporting a finding of (i)(6), a victim's inability to identify the murderer does not

---

[7]In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), this Court again refused to narrow application of (i)(6) "to only those killings which are solely motivated or predominately motived by a desire to avoid arrest or prosecution." Id. at 504 (citing State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986)). Instead we reaffirmed our prior holdings that application of (i)(6) is appropriate when proof shows that avoidance of prosecution or arrest was one of the purposes motivating the killing. Id. (citing State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993)).

preclude its application if the evidence introduced establishes that one of the purposes motivating the murder was a desire to avoid, interfere with, or prevent a lawful arrest or prosecution of him or herself or another. See, e.g., State v. Smith, 868 S.W.2d 561, 580 (Tenn. 1993) (emphasizing that it is the motive of the killing that is the critical factor).

The proof in this case amply supports this aggravating circumstance. The State theorized that the defendants murdered the victims to prevent the thefts from being reported. The proof supports this theory. The evidence showed that the defendants burglarized several residences in the area where the murders were committed. At the Cherry and Harris residences, the defendants tampered with the refrigerator lights, thereby preventing the lights from illuminating and alerting others to the defendants' presence. At the McMinn residence, as well as at the Vester home, the defendants severed the telephone lines, thereby preventing help from being summoned. The defendants stole the Vesters' automobile and used it to travel to Memphis. Taken together, this proof strongly indicates that the defendants were attempting to avoid being discovered and arrested for the numerous thefts they had committed in the Leatherwood area.

The jury's application of the (i)(6) aggravator is strengthened in this case by the fact that the defendants had escaped from prison. The evidence recounted above also establishes that the defendants were concerned with avoiding apprehension and arrest for escape at the time of the murders. The jury could have found beyond a reasonable doubt that the defendants murdered the victims so that they could steal their car to leave the area and avoid being captured. We find that the evidence is sufficient to support the jury's finding of the (i)(6) aggravating circumstance. Accordingly, we reverse the judgment of the Court of Criminal Appeals as to this issue. Because the Court of Criminal

Appeals had found the error harmless our holding in this respect does not change the result.[8]

## MURDER COMMITTED DURING ESCAPE

## AGGRAVATING CIRCUMSTANCE (i)(8)

The defendants next argue that Tenn. Code Ann. § 39-2-203(i)(8)[9] "is unconstitutionally vague as applied to the facts of this case." The defendants further maintain that aggravating circumstance (i)(8) "was intended to protect law enforcement officers." The State counters that the circumstance was properly applied as the victims were killed while the defendants were in the process of escaping to Mexico. While all members of the Court agree that the evidence in this case is sufficient to support the jury's finding of this aggravating circumstance, Justice Holder dissents from the rationale of the majority and would hold that the (i)(8) aggravating circumstance may be applied any time the proof establishes that a murder was committed by a person on escape status.

This broad interpretation of the statutory aggravating circumstance was recently rejected by this Court in State v. Odom, 928 S.W.2d 18, 27 (Tenn. 1996) (Anderson, C.J. and Drowota, J., dissenting). In Odom the murder occurred almost six weeks after the defendant had escaped from a Mississippi jail where he was serving a life sentence for another murder. The murder for which Odom was sentenced to death in Tennessee was unconnected with and did not, in any way, further his escape. Concluding that the aggravating circumstance did not apply based upon the facts in Odom's case, this Court stated:

> Our rationale is simple–"during" as used in the statute means "throughout the continuance of." The end of the escape marks the beginning of one's

---

[8]We affirm the finding of the Court of Criminal Appeals that the jury's erroneous reliance upon the invalid felony murder aggravating circumstance was harmless beyond a reasonable doubt.

[9]This aggravating circumstance applies if "the murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement."

status as an "escapee." Although Odom was, assuredly, an "escapee," by no stretch can we say that the murder occurred during the defendant's escape from lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement. When he committed the murder, Odom's escape was an accomplished fact--*a fait accompli.*

Id. at 27.

Unlike the murder in Odom, the murders in this case were committed by the defendants "during [their] escape from lawful custody or from a place of lawful confinement." Indeed, these murders were committed only four days after the defendants fled confinement in Kentucky and while the defendants were in the process of obtaining the Vesters' automobile -- a means of transportation to further their escape. Indeed, the proof shows that the escapees had remained in an area approximately two miles in diameter until they were able to steal automobiles to further their escape. Moreover, law enforcement officers were actively canvassing this small area for the defendants, searching with helicopters, tracking dogs, and four-wheel drive vehicles in an attempt to locate the escapees in the Leatherwood community. The plain language of the statute does not support the dissent's position that evidence of a defendant's escapee status, without more, is sufficient to support this aggravating circumstance. Had the General Assembly intended for the aggravating circumstance to apply under those circumstances, clear language dictating such a result could have been employed. It was not. Instead, the statute permits the aggravating circumstance to be applied if the proof demonstrates that a murder was committed by a defendant "during [the defendant's] escape from lawful custody or from a place of lawful confinement." Clearly, the defendants were still in the process of escaping from Kentucky to Mexico. These murders were simply a step toward accomplishing this end. Accordingly, we conclude that the evidence in this case is sufficient to support the jury's finding of this aggravating factor. Contrary to the

position of the dissent, this Court's decision in Odom does not preclude application of this factor.[10]

## COMPARATIVE PROPORTIONALITY REVIEW

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. State v. Hall, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Id. citing State v. Ramsey, 684 S.W.2d 320, 328 (Mo. 1993). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Bland, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." Id. (citing State v. Webb, 680 A.2d 147, 203 (Conn. 1996)).

Our proportionality review is neither a rigid nor an objective test. Hall, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. Id.; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn.

_____

[10]Apparently the dissent fails to recognize that our holding in Odom was based upon our determination that the evidence in the record on appeal was *legally* insufficient to support application of the aggravating circumstance. We did not weigh the evidence; therefore, contrary to the dissent's assertion, this Court did not supplant the jury's finding on this issue. Moreover, the dissent's assertion that the State had no opportunity to develop or argue the facts relevant to application of the aggravating circumstance again fails to recognize that in reviewing the legal sufficiency of the evidence in Odom, this Court considered the evidence in the record on appeal in the light most favorable to the State. Finally, our holding in Odom did not prevent the State from further developing the facts at the resentencing hearing to establish that Odom committed the murder to further his escape from custody and to support application of the (i)(8) aggravating circumstance. State v. Harris, 919 S.W.2d 323, 331 (Tenn. 1996) (At resentencing the State is not limited to proof presented in the initial sentencing hearing, "but is free to strengthen its case in any way it can by the introduction of new evidence.")

-28-

1994). This Court considers many variables when choosing and comparing cases. Bland, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id.; Hall, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants' age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. Id.

Considering the nature of the crime and the defendants, we find that imposition of the death penalty upon these defendants is not disproportionate to the penalty imposed in similar cases. Mrs. Vester was sixty-nine-years old at the time the defendants murdered her. She was shot at least once from outside her house while she lay in bed. Her husband was shot and murdered in an adjacent room. He died of multiple shotgun wounds to the head, neck and chest. The evidence indicates that Mrs. Vester struggled to evade the brutal attack that severed her forearm and left her wrist and hand attached only by a small piece of soft tissue, consisting of skin, muscle, and fat. The record indicates that she was shot once with a shotgun, once with a high-powered rifle, and once more with either a shotgun or a high-powered rifle. She was then stabbed thirteen times. The stab wounds were to her face, head, neck, shoulder, back and upper chest. The bottoms of her feet were covered in blood indicating that she

attempted to flee the attack by walking through a pool of her own blood. Medical testimony indicates that she survived for as long as fifteen minutes following the infliction of her wounds.

The defendants had escaped from prison and were fleeing authorities when they murdered the victims. They had committed several burglaries in the area, obtaining food and supplies. Law enforcement officials had focused their search to the two mile area encompassing the burglaries, and the defendants were desperate for a mode of transportation out of the area. They obtained the vehicle they needed by murdering the Vesters in their own home, traditionally the place of greatest safety and security. They committed the crime around midnight when the Vesters were asleep and most vulnerable to attack.

Both defendants had extensive criminal records. Quintero had been previously convicted of two charges of escape in the first degree and one charge of first degree robbery. Hall had previous convictions for two separate assaults, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice President of the United States of America. Neither defendant has shown remorse nor does either appear to be a candidate for rehabilitation. The defendants committed these brutal crimes only three days after escaping from lawful confinement which had been imposed as a result of other criminal activity. There is no evidence that the defendants were intellectually impaired, and the psychological testimony did not indicate that the defendants were insane at the time of the killings. Although there was some testimony regarding past drug and alcohol abuse, there was no proof offered to establish that the defendants were under the influence of drugs or alcohol when these murders were committed. The jury found five statutory aggravating circumstances, four of which were supported by the proof and otherwise appropriately applied. The mitigation proof related primarily to the defendants'

childhoods.  Finally, by two separate juries, all three participants in these murders, Hall, Quintero, and Blanton, have been convicted of first degree murder and sentenced to death.  Accordingly, we conclude that the nature of the defendants' crimes, their criminal backgrounds, their infliction of unnecessary and gratuitous violence, and their complete disregard for human life places them into that class of criminal defendants for whom a sentence of death is appropriate.

Hall argues that his sentence of death is disproportionate because the evidence placing him at the murder scene was circumstantial in nature.  This argument, however, is better addressed by a sufficiency of the evidence review.  The jury found Hall guilty beyond a reasonable doubt of two counts of murder in the perpetration of a felony.  The appellate court found that the evidence was sufficient to support the convictions.  The medical proof established that a minimum of three weapons were used to murder Myrtle Vester. Moreover, prints from the defendants and Blanton were found at the various burglaries in the Leatherwood community.  Items from these burglaries were found either near the victims' residence or in their car, which was abandoned in Memphis by three individuals matching the general description of these two defendants and Blanton.  In addition, these two defendants and Blanton were seen together in Memphis the day after the murder by several individuals.  Upon exhaustive review of both the record and the arguments advanced by counsel, we find that the evidence supports the jury's verdict finding the defendants guilty of first degree murder during the perpetration of felony.  Jackson v. Virginia, 443 U.S. 307 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983), cert. denied, 465 U.S. 1073 (1984); State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978); Tenn. R. App. P., Rule 13(e).  The evidence also establishes that both Hall and Quintero actively participated in the killing of the Vesters.  Accordingly, our review will now focus on the circumstances of the defendants' killings in

comparison to other killings for which murderers have received a sentence of death. This review includes a thorough examination of Rule 12 reports from trial judges submitted over the past twenty years in all criminal trials for first degree murder in which either life imprisonment or a sentence of death has been imposed. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Henley, 774 S.W.2d 908 (Tenn. 1989), the jury imposed the death penalty upon finding a single aggravating circumstance, which was also found in this case, the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5). Unlike the defendants in this case, Henley had no prior criminal record, and he had been drinking the day that he forced the victims, a married couple with whom he was acquainted, from the road to their house demanding money at gunpoint. As in this case, Henley shot the husband and then the wife in their own home. When the wife began moaning, Henley shot her two times more, poured gasoline on her body, and set the house on fire. She suffered before she eventually died from burns and smoke inhalation.

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant murdered the seventy-year-old widow in her own home by striking her in the head and face repeatedly with a glass vase. The victim was conscious during the attack for a short time, and was alive when she was found, but later died from hemorrhaging of the brain. Unlike the defendants in this case, McNish had no prior criminal record, and he had been using drugs when the murder was committed. Nevertheless, the jury imposed the death sentence upon finding a single aggravating circumstance, one which was also found in this case, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year-old defendant killed the helpless and unresisting seventy-five-year-old victim in her own home by striking her in the head five times with a crescent wrench. As in this case, the victim in Barber remained alive during at least a portion of the assault, and attempted to avoid the assault and protect herself, which was evidenced by defensive wounds on her hands. Though Barber offered mitigation proof that he was capable of rehabilitation, the jury nevertheless imposed the death penalty upon finding two aggravating circumstances, both of which were also found by the jury in this case. Tenn. Code Ann. § 39-2-203(i)(5) & (7). See Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994) (concluding, as in this case, that the jury's consideration of the felony murder aggravating circumstance was harmless error).

In State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), the twenty-two-year-old defendant abducted his female victim at gunpoint and took her to a remote location. As in this case, the victim was repeatedly stabbed, with two fatal wounds inflicted upon her right lung. Also like this case, the victim remained alive and conscious for perhaps five to ten minutes. The jury imposed the death sentence upon finding three aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(5), (6) & (7).

In State v. Payne, 791 S.W.2d 10 (Tenn. 1990), the twenty-year-old defendant entered the home of the victims and stabbed one victim approximately forty-two times and the other victim approximately nine times. The jury imposed the death penalty upon finding two aggravating circumstances, including, as in this case, that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(3) & (5).

In State v. Smith, 893 S.W.2d 908 (Tenn. 1994), a forty-one-year-old defendant broke into the home of the eighty-eight-year-old female victim. He robbed her, raped her, cut her throat and placed her into a bathtub full of water. The victim was alive when water entered her lungs. Though the defendant suffered from diminished intellectual capacity and was classified as "mentally retarded," the jury imposed the death penalty upon finding two aggravating circumstances, both of which were also found in this case, that the defendant had been previously convicted of a felony offense involving violence to the person and that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-13-203(i)(2) & (5).

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the nineteen defendant killed the victim, a seventy-four year old woman during the course of a robbery by shooting her once in the lower jaw or neck region and once in the back of the head. The victim was lying on the floor helpless when she was killed, much like the Vesters who were assaulted while they lay in their beds. The victim was a member of the family which owned the Chinese restaurant that the defendants were robbing. The family lived in the area behind the restaurant, so as in this case, the victim was murdered in her own home. The jury imposed the death sentence upon finding two aggravating circumstances, Tenn. Code Ann. § 39-2-203(i)(5) & (12).

In State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), a twenty-one-year-old defendant was convicted of felony murder and sentenced to death. In Dicks, the defendant and his co-defendant, Strouth, robbed a store and during the course of the robbery, slit the throat of the seventy-year-old male store clerk who bled to death. As in this case, the proof did not absolutely establish which individual inflicted the fatal throat wound, although it was apparently inflicted by Strouth. The jury imposed the death penalty upon finding two aggravating circumstances,

including, as in this case, that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) & (7). The jury also imposed a sentence of death upon the co-defendant Strouth, finding the same two aggravating circumstances. State v. Strouth, 620 S.W.2d 467 (Tenn. 1981).

Two other co-defendants also received the death penalty though the proof did not absolutely identify which individual was the shooter. In State v. Sample, 680 S.W.2d 447 (Tenn. 1985) and State v. McKay, 680 S.W.2d 447 (Tenn. 1985), the twenty-five-year-old defendants, in separate trials, were convicted of felony murder and sentenced to death for shooting two store clerks to death during the course of a robbery. Though Sample appeared to be the leader in the commission of the crime, the evidence did not absolutely establish the identity of the shooter. The jury imposed the death sentence in each case finding three aggravating circumstances with respect to Sample, Tenn. Code Ann. § 39-2-203(i)(3),(6) & (7), and four aggravating circumstances, Tenn. Code Ann. § 39-2-203(i)(2), (3), (6) & (7), with respect to McKay.

We also note that there are several cases with comparable violence in which defendants have received life sentences. See State v. Jack Jay North, No. 02C01-CC-00369 (Tenn. Crim. App., at Jackson, Dec. 12, 1996), app. denied (Tenn. 1997) (sentencing to life where victim shot multiple times with sawed-off shotgun); State v. James Morning Craft, Jr. and Lewis Moorlet, C.C.A. No. 31 (Tenn. Crim. App., at Jackson, Mar. 8, 1989), app. denied (Tenn. 1989) (sentencing to life where victim shot three times). In both North and Craft, the defendants either admitted to being at the scene or showed remorse. Although these cases are similar to some extent, the similarities do not render these death sentences disproportionate. As we have previously stated, our role in

-35-

conducting comparative proportionality review is to assure that no aberrant death sentence is affirmed.

We have reviewed numerous cases in which either the death penalty or a lesser sentence has been imposed. While no two cases are identical, a great majority of the cases cited involved, as does this appeal, murders of unresisting, defenseless, and elderly victims who were beaten, tortured, and assaulted in their own homes or businesses. In most of the cases cited, the killings were committed to accomplish a robbery or burglary. Unlike the defendants in this case, in several of the cases discussed, the defendants offered mitigation proof to show that they had no prior criminal record and were under the influence of drugs or alcohol when the crimes were committed. Unlike these defendants, in at least one case, the defendant had a potential for rehabilitation. After reviewing the cases discussed above, and many other cases not herein described, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of this Court, we have considered the entire record in this case and find that the sentence of death was not imposed in an arbitrary fashion. The evidence clearly supports the jury's finding of the four aggravating circumstances and that no mitigating circumstances were sufficiently substantial to outweigh the aggravating circumstances. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C). We have carefully reviewed the defendants' assignments of error and have found that they are either devoid of merit or do not require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge William M. Barker, joined in by Judge Paul G. Summers and Judge David H. Welles.

The defendants' sentences of death by electrocution are affirmed and will be carried out as provided by law on the 29th day of Janauary, 1999, unless otherwise ordered by this Court or other proper authorities.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**

Anderson, C.J.

Holder, J. - Separate Concurring/Dissenting Opinion.

Birch, J. - Separate Concurring/Dissenting Opinion.

Reid, Sp.J. - Not Participating.