# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. DAVID EUGENE BREEZEE

**Appeal from the Circuit Court for Benton County**
**No. 10-CR-45     C. Creed McGinley, Judge**

**No. W2011-01231-CCA-R3-CD  - Filed December 28, 2012**

The Defendant, David Eugene Breezee, was found guilty by a Benton County Circuit Court jury of rape, a Class B felony, and incest, a Class C felony. See T.C.A. §§ 39-13-503(b); 39-15-302(b).  At the sentencing hearing, the incest conviction was merged with the rape conviction, and the Defendant was sentenced to ten years' confinement.  On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions and that he erroneously received more than the minimum sentence of eight years because the trial court applied the multiple victims enhancement factor.  We affirm the Defendant's conviction and sentence for rape, but we reverse the trial court's merger of the incest conviction into the rape conviction, reinstate the incest conviction, and remand for sentencing as to that conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Guy T. Wilkinson, District Public Defender, for the appellant, David Eugene Breezee.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Hansel J. McCadams, District Attorney General; and James E. Williams, III and Scott Rich, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case involves the Defendant's stepdaughter.  At the trial, Benton County Sheriff's Department Sergeant Ricky Pafford testified that he received a call from Cindy Curtis with the Department of Children's Services (DCS) about a seventeen-year-old female

who reported sexual abuse to a teacher. He said he spoke to the victim and her mother at the DCS building. He said that he advised the victim's mother of her rights, that she signed a consent form, and that he told her the allegations. He said that he also spoke with the victim but that the victim was uncomfortable with his presence. He stated that he left the room and observed Ms. Curtis interview the victim through a two-way window and that the victim made a written statement to Ms. Curtis.

Sergeant Pafford testified that he interviewed the Defendant twice and that Ms. Curtis was present for the first interview. He said that on the first day, he explained the Defendant's rights to him and that the Defendant signed a consent form. He said that the Defendant was not under arrest and that the interview lasted three to four hours. He said they discussed daily routines of the Defendant's family, the Defendant's work status, and his life with teenage children. He said that he told the Defendant about the allegations and that the Defendant was visibly upset. He said that he asked the Defendant to come back the next day and that the Defendant agreed and returned early the next morning. He stated that Lieutenant Bryant Allen was present at the second interview.

Sergeant Pafford testified that the second interview was "to the point" and that the Defendant denied the victim's allegations. Sergeant Pafford explained that he took a question-and-answer statement from the Defendant and that it was initialed by the Defendant. He said the statement consisted of his questions and the Defendant's answers word-for-word. After the interview, the Defendant initialed each question, verifying that the statement was accurate. At the trial, Sergeant Pafford read portions of the statement. He read question three, "When you touched [the victim] on the twenty-fourth what was going through your mind. That was the question. The answer [the Defendant gave] me was nothing. She just stood there texting [her boyfriend]. And [the Defendant's] initials are beside it." He also read question ten, "Did you not think when you were touching [the victim] that it would not hurt? His reply: I don't know what I was thinking. He did initial that." Sergeant Pafford said he understood this to be a confession. On cross-examination, Sergeant Pafford stated that the first interview was not recorded because he did not have access to the recording equipment and that the second interview was not recorded because the recording device he used did not record. He said that the second interview was three or four hours long.

Benton County Sheriff's Department Lieutenant Bryant Allen testified that he assisted Sergeant Pafford with a non-custodial interview of the Defendant. He said that he was present at the end of the second interview and that he asked the Defendant what happened. He said that he asked the Defendant why he touched the victim and that the Defendant said he did not know why, dropped his head, and began to cry. Lieutenant Allen understood the Defendant's response to mean that the Defendant had touched the victim. He said that he asked the Defendant to initial the statements Sergeant Pafford wrote and that he thought the Defendant initialed the statement voluntarily and understood everything.

On cross-examination, Lieutenant Allen testified that he did not know why portions of his questions were not included in the statement. He said that interviews were not always recorded and that because this was a non-custodial interview, they did not record it. He said that he asked most of the questions listed in the statement but that he did not see the question asking the Defendant why he touched the victim.

Cindy Curtis, an investigator with Benton County Child Protective Services, testified that she received information about this case from DCS and that she contacted members of the child protective investigative team (CPIT). She said that she and Sergeant Pafford attempted to contact the victim at school the day after she received the report but that the victim was not there. She said they found the victim at her home. She stated that the victim was scared to talk to her because the victim's mother instructed her not to talk and that she asked the mother to bring the children to the DCS office to interview them privately.

Ms. Curtis testified that she and Sergeant Pafford spoke with the victim at the DCS office and that the victim told them the Defendant penetrated her digitally. She said the victim gave a written statement. She said she corroborated the victim's statements by interviewing siblings, parents, and others close to the victim. Ms. Curtis stated that she was present during the Defendant's first interview and the last part of the second interview. She said that while the officers were outside with the Defendant at the end of the second interview, she heard Sergeant Pafford ask the Defendant why he did it and heard the Defendant respond that he did not know. She said that she asked the Defendant if he was a victim of sexual abuse as a child and that the Defendant nodded affirmatively.

On cross-examination, Ms. Curtis testified that she followed DCS and CPIT protocol in this case. She said she was present during the last part of the Defendant's second interview because the officers contacted her and told her that he confessed. She said she erred on the side of the safety of the child when investigating child abuse cases. She said the CPIT team, not the Defendant, decided whether a medical evaluation would harm the child more or whether useful evidence would come from the evaluation. She said that once the child was "of age," digital penetration evidence would not be found in a medical evaluation.

Shane Penn testified that he and the Defendant were jail cellmates for two to three months. He said that the Defendant admitted touching the victim and that the Defendant told him the victim wanted the Defendant to touch her. Mr. Penn admitted that he was charged with assaulting the Defendant. He said that when he was released from jail, he went to see Ms. Curtis about obtaining custody of his son and that he talked to her about the Defendant's statements. He stated that she sent him to see Sergeant Pafford and that he made a written statement in Sergeant Pafford's office. On cross-examination, Mr. Penn testified that he was subpoenaed to testify at the trial. He said he went to DCS to obtain custody of his child, not to tell Ms. Curtis about the Defendant's statements. He stated that Ms. Curtis asked him

about his new assault charges and that he explained the altercation with the Defendant.

Sherry Hensley, a teaching assistant at the victim's school, testified that she had known the victim for six or seven years and that the victim was a "good kid." She said that she saw the victim in the hallway crying and that she took her into an empty classroom to ask her what was wrong. She said that after the victim told her and another teacher what happened, she stayed with the victim while the other teacher called the authorities. On cross-examination, she said she did not remember if the victim's sister's boyfriend was around the victim.

The victim's sister testified that the victim was in the victim's bedroom talking to her boyfriend on the phone when their stepfather entered the bedroom and close the door. She said that after the door had been closed for approximately fifteen minutes, she opened the door and saw the Defendant with his hand down the front of the victim's pants. She said that his left arm was on the wall above the victim's head pressing against the wall preventing the victim from moving and that his right arm was down the front of the victim's pants. She stated that the victim was texting the victim's boyfriend. She said that she "got a very good look" and that her boyfriend also saw the incident. She said that when the Defendant made eye contact with her, he walked out of the room and washed his hands in the kitchen.

On cross-examination, the victim's sister testified that she had dated her boyfriend for about four years at the time of the allegations and that he dated her sister before her. She said the Defendant did not like that her boyfriend stayed overnight frequently. She said that at the time of the incident, the Defendant found a place to rent and that they were moving. She said that she, her boyfriend, and the victim went to the girls' bedroom, closed the door, and talked about what she saw and that when they left the bedroom, the Defendant took the victim to his bedroom.

The victim's sister's boyfriend testified that he and the victim's sister were sitting in the living room and saw the Defendant walk into the victim's bedroom and closed the door. He said that about fifteen minutes later, the victim's sister opened the bedroom door and that he could see into the victim's bedroom. He said he saw the Defendant pinning the victim to the wall with his hand down her pants. He said the Defendant walked out, went into the kitchen, and washed his hands. He said that the victim came into the kitchen and that the Defendant pulled her into his bedroom. He said they were in the Defendant's bedroom for about ten minutes before the two walked out together. He said that he and the victim's sister spoke to the victim to confirm what they saw and decided to tell someone at school the next day.

On cross-examination, the boyfriend testified that the victim and her sister told him the Defendant did not like his spending the night at their house regularly. He said that he

dated the sisters at the same time and that they knew he was dating both of them. He said that he and the victim fought a lot and that they pushed each other and "stuff like that." He said that the Defendant never said anything to him about staying overnight and that he did not know the Defendant planned to move the family. He said that he and the victim's sister told his friend at school what happened and that his friend told the principal. He said that at the time of the trial, the victim's sister had moved and that they were no longer dating.

The victim testified that the Defendant was her stepfather and that on February 24, 2010, she was in her bedroom crying and texting her boyfriend because she learned the family was moving. She said that the Defendant came into her bedroom, pinned her against the wall, and put his hand down her pants and that he "play[ed]" with her vagina, "sticking his fingers inside [her]." She said that when her sister entered the bedroom, he immediately stopped, went to the kitchen, and washed his hands. She said that she spoke with her sister and her sister's boyfriend immediately after the incident and that they decided to tell the victim's mother what happened. She said that she went to the kitchen after they talked, that the Defendant took her cell phone, and that she followed him into his bedroom to get her phone. She stated that he asked if he could perform oral sex on her but that she told him no. He grabbed her, but she took her phone and left the bedroom.

The victim testified that her sister and her sister's boyfriend decided to tell someone at school and that she agreed. She said that they told the principal and that she met with Ms. Hensley. She stated that she remembered meeting with the Department of Human Services and giving a statement but that she did not remember what she said. She said her sister's boyfriend was not her boyfriend at the time but had been previously. She said her sister's boyfriend hit her during and after their relationship until her current boyfriend persuaded him to stop.

On cross-examination, the victim testified that she did not remember if her neighbor, Patrick Horn, was at the house on the day of the incident. She said she knew of and approved of her sister's boyfriend's dating her and her sister at the same time. She said that he lied to her during their relationship about whether his relationship with the victim's sister was ongoing and that she hit him. She said they had a violent relationship. She thought her sister told her sister's boyfriend that they were moving. She stated that her sister and her sister's boyfriend told another student and the principal what happened but that she did not know they were going to tell the principal. She said she told Ms. Hensley what happened after her sister and her sister's boyfriend told the principal. She said that she was texting her boyfriend with both hands while the incident occurred and that she was telling her boyfriend that she wanted it to stop. She said she did not scream because she did not want the Defendant to hit her.

Patrick Horn testified for the defense that he was at the Defendant's home the evening

of the incident and that the victim was "crying and carrying on." He said her "fits became ruckus enough that [the Defendant] needed to go handle it and he did." He said that the Defendant went into the bedroom with the victim and spoke too quietly for him to hear what was said. He said the Defendant was in the bedroom with the victim for only a few minutes.

Johnny Sterling, an inmate who was in jail with the Defendant, testified for the defense that he never heard the Defendant admit doing anything to the victim. He stated that Mr. Penn was not truthful in his testimony regarding the Defendant and that the Defendant would not have talked about his case because a charge like that could "[g]et you killed" in jail.

Upon this evidence, the jury found the Defendant guilty of rape and incest, and the trial court merged the two convictions and sentenced him to ten years' confinement. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. He argues that his stepdaughters fabricated the allegations because they "were upset and did not like it because they were moving away from their boyfriends" and that his confession was not credible because without a recording, there was "no way to accurately know the context of the questions and answers." The State counters that the evidence is sufficient to support both convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." <u>State v. Sutton</u>, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. <u>State v. Richmond</u>, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); <u>State v. Buttrey</u>, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is

the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, rape is the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . [f]orce or coercion . . . [or] without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)(1), (2) (2010). A person commits incest if he "engages in sexual penetration . . . with a person, knowing the person to be . . . [his] stepchild." T.C.A. § 39-15-302(a)(1) (2010). Sexual penetration is "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" T.C.A. § 39-13-501(7) (2010).

In the light most favorable to the State, the evidence shows that the Defendant entered the victim's bedroom, pinned her against the wall, and put his fingers inside her vagina. The victim stated that she could not get away from him and that she told him to stop. She also identified the Defendant as her stepfather. The jury rejected the Defendant's claim that his statement was suspect because it was not recorded. The jury's guilty verdict, approved by the trial court, credits the testimony of the victim and other State witnesses and accepts the Defendant's admissions. We conclude that a rational jury could have found beyond a reasonable doubt that the Defendant raped the victim and that the evidence is sufficient to sustain his convictions. The Defendant is not entitled to relief.

**II**

The Defendant contends that the trial court erred in sentencing him to ten years' confinement, two years above the statutory minimum, because the court erroneously applied an enhancement factor based on his offense involving more than one victim. See T.C.A. § 40-35-114(3) (2010). He states that the four-count indictment was severed into two cases, one for the offenses against the victim in this appeal and one for the offenses against the victim's sister. He notes that at the time of the sentencing hearing, he had not been convicted of the charges related to the victim's sister. He argues that he should have received an eight-year sentence because the trial court misapplied the only enhancement factor it found at the sentencing hearing and because he had no prior criminal record. Although the State agrees the court erred in applying the multiple victim enhancement factor, it argues that the ten-year sentence is still a "legal sentence within the range of punishment."

Previously, this court's review of the length of a sentence was de novo with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d) (2010). Recently, though, the Tennessee Supreme Court adopted a new standard of review for sentencing in State v. Susan Renee Bise, — S.W.3d —, —, No. E2011-00005-SC-R11-CD, slip op. at 29 (Tenn. Sept. 26,

2012). Currently, length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Id. at slip op. 30.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. State v. Susan Renee Bise, — S.W.3d —, —, No. E2011-00005-SC-R11-CD, slip op. at 29 (Tenn. Sept. 26, 2012). We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. "A trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 28. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

The presentence report shows that the Defendant had not been convicted of counts one and two of the indictment at the time of the sentencing hearing in this case. Both parties agree that the trial court should not have applied the multiple victim enhancement factor. We conclude the enhancement factor was erroneously applied.

We note, though, the ten-year sentence was within the statutory range for rape. At the sentencing hearing, the trial court reviewed the presentence report and permitted the State to read a letter written by the victim. The court found that the Defendant had no prior criminal convictions, making him a Range I, standard offender, subject to a range of eight to twelve years for the rape conviction. The court reviewed and found inapplicable enhancement factors based on the Defendant's prior criminal convictions, his leadership in the commission of the offense, the offense involving a particularly vulnerable victim, and exceptional cruelty to the victim. The court only applied the enhancement factor based on the offense having more than one victim, which we have determined to be inapplicable. The court found the minimum and maximum sentences were not appropriate and sentenced the Defendant to ten years' confinement.

In considering alternative sentencing, the court noted that "the victim's letter speaks volumes about someone basically in a position of trust. That might be an enhancing factor, but I think it was a part of the elements of the offense." See T.C.A. § 40-35-114(14) (2010). The court did not analyze this enhancement factor on the record before announcing the ten-year sentence and erred in finding that the Defendant's being in a position of trust was an element of the offense. The sentence at issue is for the rape conviction, and the elements of rape do not include such a relationship. See T.C.A. §§ 39-13-503(a), 40-35-114(14) (2010). The court found that the victim's letter established that the Defendant was "someone basically in a position of trust." Our supreme court held that the "position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of someone in a position of trust. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). The Defendant was the victim's stepfather, and they lived in the same house. The Defendant had been the victim's stepfather for ten years. She referred to herself as the Defendant's daughter in her letter to the court and described the emotional issues the offense caused her. Because the record establishes that the Defendant was in a position of trust at the time of the offense, we conclude that the ten-year sentence is consistent with the purposes and principles of sentencing and that the sentence is within range and supported by the record. The Defendant is not entitled to relief on this issue.

### III

Although not raised as a separate issue, the State contends that the case should be remanded for the reinstatement of and sentencing for the incest conviction. The State argues that the trial court erroneously merged the incest and rape convictions and that the case should be remanded to reinstate the incest conviction and for resentencing on that conviction. We note that the proper way for an appellee to request relief on appeal is to present an issue for relief. T.R.A.P. 27(b); see, e.g., State v. Hayes, 894 S.W.2d 298, 300-01 (Tenn. Crim. App. 1994). Such was not done in this case. In any event, we view the merger to be plain error. At the sentencing hearing, the trial court found that although incest was not a lesser-included offense, the incest conviction should merge into the rape conviction because both convictions stemmed from a single act. Both the rape and incest charges required penetration for the jury to convict, and, because the victim's testimony only included a description of one act of sexual penetration, the court determined that both convictions concerned a single act.

Although both incest and rape require penetration, rape requires the element of force, coercion, or sexual penetration that is accomplished without the consent of the victim, which is not required for incest, and incest requires the element of familial relationship, which is not required for rape. The two offenses are not the same for double jeopardy principles because each "requires proof of an element that the other does not." State v. Samuel L. Giddens, Jr., No. M2005-00691-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App. Mar. 13, 2006) (citing State v. Jason D. Pillow, No. M2002-01864-CCA-R3-CD, slip op. at 14 (Tenn.

Crim. App. Aug. 13, 2003)); see State v. Watkins, 362 S.W.3d 532 (Tenn. 2012) (holding that the same elements test in Blockburger v. United States, 284 U.S. 299, 304 (1932), is the applicable test in Tennessee for determining whether multiple convictions under different statutes constitute the same offense for double jeopardy principles). The trial court should not have merged the incest conviction into the rape conviction because each is legally distinct. State v. Brittman, 639 S.W.2d 652, 654 (Tenn. 1982); William Hackworth v. State, No. M2003-02148-CCA-R3-PC, slip op. 3 (Tenn. Crim. App. July 28, 2004) (holding that incest is not a lesser included offense of rape and both convictions are appropriate). Upon remand, the conviction for incest shall be reinstated, and the trial court shall determine the appropriate sentence.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's conviction and sentence for rape, but we reverse the trial court's merger of the incest conviction into the rape conviction, reinstate the incest conviction, and remand for sentencing as to that conviction.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE