## State of Vermont v. Charles H. Gundlah

[702 A.2d 52]

No. 96-052

Present: **Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.) and Dier, Supr. J. (Ret.), Specially Assigned**

Opinion Filed July 3, 1997

*Jeffrey L. Amestoy,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Michael Rose,* St. Albans, for Defendant-Appellant.

**Johnson, J.** Defendant Charles Gundlah appeals four of eighteen convictions that resulted from a series of incidents culminating in the murder of a schoolteacher, Robin Colson. Defendant argues that (1) the trial court abused its discretion by denying his motion for a

mistrial after a State's witness repeated the nontestifying accomplice's hearsay statement implicating defendant in the murder; (2) the court abused its discretion by admitting into evidence a videotape showing the exhumation of Colson's body; (3) the court erred by denying his motion for judgment of acquittal with respect to one unlawful mischief count and two petit larceny counts; and (4) the sentencing court erred in considering as an aggravating factor that defendant was in custody under sentence of imprisonment. We vacate one of the unlawful mischief convictions, but affirm the remaining convictions, including the felony-murder conviction.

On April 8, 1991, defendant and Christopher Bacon, who at the time were both inmates at the Woodstock Correctional Facility, escaped together from a prison work crew. Over the next four days, the men allegedly broke into and vandalized several summer camps before going to Colson's home to steal her car. Late on April 11 or early the next morning, the two men allegedly entered Robin Colson's home, bludgeoned and stabbed her to death, buried her in a shallow grave near her home, and then took her car. Two days later, the men were apprehended in Rutland.

Following his arrest, Bacon related his version of the circumstances surrounding Colson's death to police in a tape-recorded statement. Defendant and Bacon were tried separately. This Court reversed Bacon's first murder conviction, see *State v. Bacon*, 163 Vt. 279, 658 A.2d 54 (1995), and he was reconvicted in January 1996 following a second trial. Defendant was charged with felony murder, seven counts of burglary, six counts of petit larceny, one count of grand larceny, and four counts of unlawful mischief. After a jury trial, he was found guilty of all charges except for one petit larceny count that had been dismissed. Defendant received a sentence of sixty years to life for the felony-murder conviction, and lesser sentences for the other convictions, resulting in a cumulative sentence of seventy-two years to life.

I.

Defendant first argues that the trial court was obligated to declare a mistrial after a State's witness related Bacon's hearsay statement implicating defendant as an accomplice in Colson's murder. We conclude that because defendant was not unduly prejudiced by the statement, the court did not abuse its discretion in denying defendant's motion for a mistrial.

The challenged testimony occurred during the State's redirect examination of Detective Sergeant William Pettengill, one of the

police officers who had investigated the murder. While cross-examining Pettengill, defense counsel had sought to establish that Bacon had an affinity for knives. On redirect, Pettengill stated that part of the basis for his belief that Bacon had an affinity for knives was a conversation he had with Bacon at the state police barracks on April 14, 1991. When the state's attorney asked Pettengill whether Bacon told him during that conversation how he had come into possession of a scuba knife,[1] defense counsel objected. Following a bench conference, the court allowed the questioning to continue.

After Pettengill testified that Bacon stated he received the knife from Gundlah, the following colloquy ensued:

> Q: Did Mr. Bacon indicate to you why Charlie gave him the knife?
> A: Yes.
> Q: What did he tell you?
> A: Because he chickened out while they were en route to Robin's house.

At this point, defense counsel asked the trial court to declare a mistrial. The state's attorney responded that Pettengill did not give the expected answer, and that a curative instruction should be sufficient to overcome any prejudice to defendant resulting from the statement. The court immediately informed the jurors that they were to put the last response out of their minds and not consider it in any way in determining the issues in the case.

On appeal, defendant argues that because he could not cross-examine Bacon, who had invoked the Fifth Amendment and refused to testify, and because the challenged statement was the only direct evidence that he and Bacon contemplated the use of force against Colson, the trial court had no choice but to grant his motion for a mistrial. In support of this argument, defendant cites *Bruton v. United States*, 391 U.S. 123, 126 (1968), where the Supreme Court held that the defendant was deprived of his constitutional right to confront and cross-examine witnesses when his nontestifying codefendant's confession naming him as a participant in the crime was admitted into evidence at their joint trial, even though the jury was instructed to consider the confession only against the codefendant.

---

[1] The State's medical examiner later testified that the scuba knife could have caused the wound resulting from the final fatal blow to Colson.

■ *Bruton* is not controlling. Indeed, as the Court in Bruton stated:

> Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. "A defendant is entitled to a fair trial but not a perfect one." It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, . . . there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a [nontestifying] codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135-36 (citations omitted).

The instant case is more similar to the situation in *United States v. Burroughs*, 935 F.2d 292 (D.C. Cir. 1991), where the codefendant testified regarding a statement made by a third accomplice (who was tried separately) implicating the defendant in the commission of the charged offenses. Although the trial court struck the response and admonished the jury to disregard it, the defendant claimed that *Bruton* required a mistrial. The federal appeals court disagreed, stating:

> Mere recitation of *Bruton's* holding shows that it is inapposite. *Bruton* deals with joint trials in which a confession is properly admitted with respect to one defendant, but would be hearsay and thus inadmissible with respect to a codefendant. The resulting violation of the Confrontation Clause cannot be avoided by instructing the jury to perform, in the words of Judge Learned Hand, the "mental gymnastic" of considering the confession only in regard to the confessor's guilt, while disregarding its implication of the codefendant. The jury here did not have to attempt any such mental gymnastic for the quite apparent reason that [the codefendant's] unresponsive answer, which did not amount to a

confession by anyone, was not allowed into evidence for any purpose.

The case is therefore not governed by *Bruton's* conclusive presumption that the jury will not, cannot, follow even the strongest instruction not to consider a codefendant's confession against the nontestifying defendant implicated by it.

*Id.* at 294-95 (citations omitted); see *United States v. Johnson*, 769 F. Supp. 389, 397 (D.D.C. 1991) (government witness's hearsay testimony implicating defendant did not raise *Bruton* problem, which arises when codefendant's confession is admitted into evidence).

█ The same reasoning applies here. Thus, the real issue is whether defendant was entitled to a mistrial on the ground that the court's instruction was insufficient to cure any prejudice he might have suffered as the result of Detective Pettengill's hearsay statement. See *Burroughs*, 935 F.2d at 295. Unlike the situation in *Bruton*, in making this determination, neither the trial court nor this Court need presume that the jury would disregard the court's curative instruction. *Id.* Rather, in ruling on a mistrial motion under circumstances such as these, the trial court should evaluate "the demeanor of the witness, the content of the stricken testimony, its likely impact, and the probable effect of cautionary instructions swiftly and firmly administered." *Id.* Because these are necessarily matters of degree calling for the trial court's judgment, the court's ruling on a mistrial motion will be reversed only for an abuse of discretion. *Id.*; see *State v. Jones*, 160 Vt. 440, 449-50, 631 A.2d 840, 847 (1993) (trial court has discretion in ruling on motion for mistrial, but should not grant motion unless moving party establishes prejudice; court's ruling will be upheld on appeal unless its discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable).

█ In determining the prejudicial impact of an incriminating hearsay statement, the probative force of the statement must be compared with the admissible evidence that supports the verdict. *United States v. Eccleston*, 961 F.2d 955, 959 (D.C. Cir. 1992). Here, the single challenged clause — "Because he chickened out while they were en route to Robin's house" — adds little to the State's case because it is ambiguous and the jury could have interpreted it in different ways. The parties on appeal assume that "he" refers to

defendant, and presumably the jury made the same assumption.[2] Defendant argues that even though the statement indicated that he (defendant) chickened out, it was prejudicial because it showed that the two men had contemplated using force against Colson. But, as the State points out, the jury could have also considered the statement as indicating that defendant had backed away from any such plan. Moreover, the statement does not clearly and directly implicate defendant. Defendant reads far too much into the statement in asserting that its import is that he and Bacon were going to Colson's house together to kill Colson, and that he was going to be the one to inflict the fatal wound, but that he chickened out and decided Bacon should do it instead.

At most, from defendant's perspective, one of the possible *inferences* that can be drawn from the statement is that the two men had considered confronting Colson with a knife. Cf. *id.* at 961 (because government's case was weak and there was nothing "inferential" in police officer's incriminating hearsay testimony directly implicating defendant in selling drugs, trial court abused its discretion in denying mistrial motion). This is hardly the type of "powerfully incriminating" evidence that requires reversal, particularly in light of the court's immediate curative instruction and the substantial evidence presented by the State demonstrating the complicity between Bacon and defendant from the time they planned their escape up until the time they were apprehended. Cf. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (*Bruton* protects against "powerfully incriminating" effect of nontestifying accomplice pointing finger directly at defendant; by contrast, inferential incrimination can be cured by trial court's admonition).[3]

---

[2]This is a logical assumption in the context of the colloquy in which the hearsay statement was made. But, in fact, the "he" probably referred to Bacon. According to Bacon's statement to police following the murder, he and defendant had planned that he (Bacon) would enter Colson's house and brandish a metal bar to intimidate her into giving them the keys to her car, but that when he lost his nerve he gave the metal bar to defendant and took the knife that defendant had been carrying. See *State v. Bacon*, 163 Vt. 279, 283-84, 658 A.2d 54, 58 (1995).

[3]The challenged statement in *Richardson* is very similar in nature to the challenged statement in the present case. There, the State introduced the nontestifying codefendant's confession, which had been redacted to omit all indication that anyone other than the codefendant and a third accomplice (the alleged trigger man) had participated in the murder of the two victims. The confession described a conversation that the accomplice and the codefendant had had as they drove to the victims' house, during which time a gun was displayed and the principal stated that he would have to kill the victims after the robbery. The defendant's name had been redacted from the

The State's evidence, on the other hand, demonstrated that the two men planned to steal a car after their escape, that they broke into several camps and took various weapons, that they asked a nearby tree pruner about Colson's house just days before the murder and learned that Colson was a single woman living alone, that they wore gloves and had at least one weapon when they went to Colson's house, and that they cooperated in disposing of Colson's body. Further, the State elicited testimony that defendant handed Bacon a knife on the way to Colson's house. Only the ambiguous single answer that followed that testimony is challenged here. That answer did not require a mistrial. Cf. *Burroughs*, 935 F.2d at 295 (in view of relatively minor impact of codefendant's unresponsive and self-serving statement and stern nature of trial court's curative instruction, court acted well within its discretion in denying mistrial motion).

## II.

Defendant also argues that the trial court abused its discretion by allowing the jury to view a short videotape showing the gravesite and the exhumation of Colson's body. According to defendant, the potential prejudicial impact of the tape far outweighed any probative value it might have had. The State offered the videotape, which was edited to keep out the most graphic views of the body, to demonstrate the joint undertaking necessary for defendant and Bacon to lift Colson's body and the large stones that covered the grave. The trial court agreed that the videotape had probative value.

On appeal, defendant argues that the videotape should have been excluded because, at most, it showed only that he and Bacon cooperated *after* the murder was committed, and not that he planned or participated in the murder itself. We conclude that the videotape had probative value to show the continuing complicity between defendant and Bacon from the time they planned their escape until the time they were apprehended. Further, the potential for prejudice

---

conversation, but her own testimony showed that she had been present in the back seat of the car when the conversation took place. Even though the confession contained the only direct evidence demonstrating that the defendant intended to participate in the robbery knowing that murder was a foreseeable result, the Court concluded that this type of evidence did not fall within the *Bruton* rule because it incriminated the defendant only after being linked to other evidence in the case. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). According to the Court, if a jury has to link different pieces of evidence for the challenged evidence to be incriminating, then the court's instruction to disregard the challenged evidence would more likely dissuade the jury "from entering onto the path of inference in the first place." *Id.*

was not great. Nine slides showing Colson's wounds were also admitted into evidence for examination by the jury, and the court concluded that the brief part of the videotape showing the exhumation of Colson's body was not particularly gruesome. Under the circumstances, the court did not abuse its discretion in concluding that the probative value of the videotape was not substantially outweighed by the danger of unfair prejudice. See *State v. Robinson*, 158 Vt. 286, 291, 611 A.2d 852, 855 (1992) (balancing test required by V.R.E. 403 is applied by trial court in its sound discretion, and reversal is required only for abuse of that discretion).

## III.

Next, defendant argues that the State failed to present sufficient evidence to prove (1) an unlawful mischief charge based on damage done to a sofa and easy chair at the Payne camp and (2) two petit larceny charges based on the theft of the scuba knife from the Zoller camp and a handgun from the Gamberdella camp. According to defendant, because both he and Bacon had the opportunity to commit those offenses and there was no evidence as to which one actually did so, the State could not prove that defendant committed the crimes. Defendant further claims that the State could not prove that he was liable as an accomplice because there was no evidence that any of the three offenses were contemplated by him and Bacon under a preconceived plan.

Given the evidence showing (1) defendant's and Bacon's concerted efforts in committing whatever crimes were necessary to facilitate their escape and avoid recapture, (2) defendant's presence at the Gamberdella camp, and (3) defendant's possession of another item stolen at the Gamberdella camp, the jury could have concluded beyond a reasonable doubt that defendant was at least an accomplice in stealing the handgun. Further, defendant did not specifically argue in his motion for judgment of acquittal that the State failed to prove he stole the scuba knife. In light of the evidence tying that weapon to the murder, we find no plain error in the court denying judgment of acquittal with respect to that charge.

We agree with defendant, however, that there was insufficient evidence for the jury to conclude that he damaged, or was an accomplice in damaging, the sofa and chair at the Payne residence. We vacate that conviction, but decline to remand the case for resentencing because it is absolutely clear from the sentencing court's

remarks that the five-to-six-month sentence imposed for the damage to the Payne furniture, which was to run concurrently with the other burglary and misdemeanor sentences imposed for crimes not associated with the Colson residence, had no effect on the length of any of the other sentences imposed by the court. See *State v. Simpson*, 160 Vt. 220, 225-26, 627 A.2d 346, 350 (1993) (when less than all of convictions in case are reversed on appeal, remand for resentencing is appropriate only when reversed convictions or sentences for reversed convictions appear to have influenced trial court's sentencing regarding affirmed convictions; court's imposition of separate concurrent sentences does not negate possibility of influence, but reviewing court cannot conclude, based solely on trial court's simultaneous imposition of separate concurrent sentences for multiple convictions, that sentence for one offense influenced sentence for another offense).

## IV.

Finally, defendant argues that because he was neither physically restrained nor submissive to authority when the murder occurred, the sentencing court erred in finding as an aggravating factor that the murder was committed while defendant was "in custody under sentence of imprisonment." See 13 V.S.A. § 2303(d)(1). Defendant contends that § 2303(d)(1) applies only to prisoners committing murder within the confines of prison walls, speculating that the Legislature intended to protect correctional officers and inmates from harm.

We find no merit to this argument.[4] Section 2303(d)(1) is intended as an additional deterrent to homicide by persons less likely to be deterred by the prospect of further confinement. Model Penal Code § 210.6(3)(a), commentary at 136 (Official Draft 1980). The rationale behind this policy applies with equal if not greater force to

---

[4] Taken to its logical extreme, this argument means that 13 V.S.A. § 2303(d)(1) could not be applied to a prisoner who killed a prison guard just outside the walls of the prison after escaping from confinement. Under defendant's analysis, the prisoner would neither have submitted to authority nor been under physical restraint at the time of the murder.

In *State v. Turgeon*, 165 Vt. 28, 34, 676 A.2d 339, 342-43 (1996), we held that because the defendant had neither submitted to the arresting officer's authority nor been physically restrained by the officer, he had never been "in custody" and thus could not be guilty of the crime of escape. Obviously, that holding does not govern this case. Here, defendant had been placed in lawful custody following conviction, and had not been released from custody at the time of his escape.

escapees, who face an even longer term of imprisonment after apprehension and whose conduct demonstrates the need for greater deterrence. Cf. *People v. Davis*, 794 P.2d 159, 181-82 (Colo. 1990) (legislative policy that is served by applying aggravating factor "under sentence of imprisonment" to incarcerated felons — providing additional deterrence to persons with little to lose in committing criminal acts — also applies to parolees who have shown by their previous conduct that additional deterrence may be required).

■ Defendant argues that allowing § 2303(d)(1) to be applied against escaped prisoners renders the phrase "in custody" superfluous. See *State v. Beattie*, 157 Vt. 162, 165, 596 A.2d 919, 921 (1991) (construction of statute that renders part of it surplusage is not favored). There is no indication, however, that the Legislature inserted the words "in custody" to prevent courts from applying § 2303(d)(1) to escaped prisoners, and we will not apply a rule of statutory construction in a way that is inconsistent with legislative intent or that creates absurd or irrational results. See *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (rules of statutory construction may be relied upon where appropriate, but not where they lead to results inconsistent with legislative intent); *In re S.B.L.*, 150 Vt. 294, 301, 553 A.2d 1078, 1083 (1988) (statutes must be interpreted to avoid irrational or unreasonable results); *State v. Stevens*, 137 Vt. 473, 481-82, 408 A.2d 622, 627 (1979) (in construing statute, every word should be given effect if possible, but if words seem unnecessary or have no meaning within scheme of statute, they will be treated as surplusage and disregarded in order to effect legislative intent). The court did not err in considering as an aggravating factor that defendant was "in custody under sentence of imprisonment."

*The unlawful mischief conviction based on Count 8 is vacated; the remaining convictions are affirmed.*