NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 50

No. 2020-048

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Essex Unit, |
| | Criminal Division |
| | |
| Gordon Noyes, Jr. | March Term, 2021 |

Robert R. Bent, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **EATON, J.** Defendant Gordon Noyes, Jr., was convicted by jury verdict of aggravated, repeated sexual assault of a child and lewd and lascivious conduct with a child, second offense. On appeal, he requests vacatur of these convictions and remand to the trial court, which he argues erred in (1) denying his motion for a mistrial following an expert witness's hearsay testimony in violation of a pretrial order; (2) allowing the same expert to testify regarding sex-offender behavior; and (3) permitting the jury to see a video of the complaining witness's statement to law enforcement in addition to her live testimony. In the alternative, defendant contends that if none of these individual circumstances merits reversal, their cumulative impact does. We affirm.

¶ 2.    Due to the nature of defendant's argument on appeal, we begin by recounting the relevant procedural history of this case in some detail.  The complaining witness, A.O., was ten years old in September 2013 when she made the disclosure giving rise to the instant charges.  In the month following her mother's subsequent report to law enforcement, A.O. provided two recorded forensic interviews to an investigating officer, Sgt. Andrew Jensen of the Special Investigations Unit.  At Sgt. Jensen's behest, A.O. was also interviewed and physically examined by Dr. Karyn Patno, a pediatrician specializing in child abuse.

¶ 3.    Six years elapsed before the case was ready for trial.  In that time, the court resolved several evidentiary disputes among the parties.  Defendant had moved to exclude testimony by Dr. Patno, Sgt. Jensen, mother, and mother's partner about A.O.'s statements to them under Vermont Rule of Evidence 804a.  Rule 804a is a limited exception to the hearsay rule applicable to statements by children under the age of twelve, provided those statements carry certain enumerated indicia of reliability.  Applying this standard, the trial court held that A.O.'s statements to her mother and mother's partner were admissible under Rule 804a, as was the video of A.O.'s first interview with Sgt. Jensen, subject to any other evidentiary objections.  But because the court found that law enforcement sent A.O. to see Dr. Patno for the purpose of gathering evidence, it concluded that although "the State would no doubt like to put on a well credentialed doctor to say that A.O. told her substantially the same thing as she said in her forensic interview," A.O.'s statements to Dr. Patno did not satisfy Rule 804a's hearsay exception and would not be admitted.

¶ 4.    However, several evidentiary disputes remained to be considered.  In the days prior to trial, defendant filed a motion in limine seeking to exclude portions of Dr. Patno's noticed testimony, and the State filed a motion indicating its intent to admit the video recording of Sgt. Jensen's first interview with A.O.  The court took both matters up at a hearing the day before the trial began.

¶ 5. At that hearing, defense counsel explained that he had no objection to Dr. Patno's broader proffered testimony, including her opinion that the lack of physical indicia of abuse found in her examination of A.O. could be reconciled with A.O.'s statement that defendant penetrated her. However, he argued that Dr. Patno should not be permitted to testify about how she understands perpetrators of child sexual assault to behave. He highlighted the following portion of her written disclosure, in which she proposed to opine:

> The most common perpetrator in child sexual abuse is a neighbor or close family friend. These perpetrators often plan to reuse their victims for the purpose of on-going sexual pleasure. In order to reuse a victim, it is important not to hurt or injure the victim during the assault, for if the victim is injured, she/he will cry, bleed and alert a parent or care giver. At that point the child will be discovered as a "victim" and the likelihood that the perpetrator will be discovered is great. The perpetrator's main goal is sexual gratification without discovery. This can easily be accomplished by rubbing the penis between the labia majora of the female victim thus avoiding penetration past the hymen into the vagina. . . . This results in sexual pleasure for the perpetrator with minimal pain or injury to the child victim.

Defense counsel objected to this opinion on two grounds: first, he argued that it could not be supported by scientific literature; second, he contended that it led to the impermissible inference that because perpetrators of child sexual assault try not to injure their victims, and there was no evidence of injury detected in A.O.'s exam, defendant must be a perpetrator of child sexual assault.

¶ 6. Despite defense counsel's thorough explanation, the prosecutor repeatedly professed not to understand defendant's objection. Dr. Patno was called in the hopes that her testimony would elucidate the matter. She explained that there is literature in the field based on perpetrator admissions and interviews with children, and that although some might consider these findings "anecdotal," they are "part of the literature base that goes into understanding this field of medicine." Defense counsel asked her whether there was scientific research or literature "as to how often perpetrators do one type of sexual abuse as opposed to the other." She responded, "probably not that I'm aware of." Asked whether she could quantify or characterize "how often a

3

perpetrator would do this less-intrusive type of sexual abuse as opposed to the more-intrusive type of sexual abuse," Dr. Patno indicated that she "can say it's common," but could not opine as to what percentage of the time it takes place. She clarified that from her understanding of the science and literature, "it is the opinion of people in this field," based on "experience and case review," that the less-intrusive form of abuse "happens commonly."

¶ 7. Defense counsel and Dr. Patno then discussed Dr. Patno's projected trial testimony about what a child's perception of penetration might be. Defense counsel indicated he did not object to testimony on this specific point. Dr. Patno said, "Well, that's what I'm going to testify to." The court asked, "if she testifies in a consistent fashion in what she just talked about, no objection?" Defense counsel responded, "Correct, Judge," confirming that the motion in limine had not "identified an objectionable statement from this witness," as he did not "see any problem with what [Dr. Patno] just said right there about what her role would be."

¶ 8. As to the video of Sgt. Jensen's first interview of A.O., defendant objected to the jury viewing it for two reasons. First, defense counsel indicated, without further elaboration, that he was concerned defendant would be prejudiced by the State playing "video evidence of a ten-year-old, when we're going to have a witness who's sixteen years old." The second basis for the objection was the affirming statements that Sgt. Jensen and a Vermont Department for Child and Families (DCF) worker who was present for the interview made to A.O. as she spoke with them. The court ruled that the final portion of the video, which contained the statements defendant identified, was not to be played for the jury. It did not issue any ruling on the prejudice question, and when the court inquired as to whether there were any other evidentiary issues to be addressed in advance of trial, defense counsel said no.

¶ 9. Defendant's trial began the next day. In the State's opening statement, the prosecutor explained that A.O. had not alleged "a violent rape." He indicated that he expected Dr. Patno to testify, on the basis of the scientific literature, that "this type of—they're rather gentle

4

with the—that [defendant] was—I believe the testimony will show that the child felt pain when she was penetrated but that it did not cause bleeding. Dr. Patno will tell you what probably happened in that situation." Defendant immediately objected to any discussion of "what probably happened," noting that this was precisely the area he thought Dr. Patno had indicated she would not enter in the motion hearing the day before. The court sustained the objection and asked whether defendant was requesting a curative instruction on this point. Defendant did not seek an instruction, instead asking that the State move on with its opening statement.

¶ 10. At trial, the State called A.O., her mother, her mother's partner, Sgt. Jensen, Dr. Patno, and a second expert, Dr. William Ballantyne. The evidence presented through these witnesses was as follows. During the five-year period between November 2007 and June 2013 when the offenses were alleged to have taken place, A.O.'s maternal aunt was married to defendant. A.O.'s aunt and her children lived with defendant and his mother; defendant's children sometimes stayed there too. A.O., an only child, enjoyed spending time with her cousins; when mother went on vacation, she would drop A.O. off for overnights at defendant's residence. A.O.'s aunt had to leave the home in the early hours of the morning for work, leaving the children in defendant's care.

¶ 11. A.O. stopped visiting defendant's home after June 2013 because defendant and her aunt had separated. Then, in September 2013, after watching a television show with her mother which included a joke about sexual assault, A.O. disclosed to her mother that defendant had touched her inappropriately. Mother asked A.O. to repeat her statement to mother's partner. He also testified to the same report. Mother then called the police. Mother indicated that up until the date of A.O.'s disclosure, she was on good terms with her sister and defendant.

¶ 12. A.O. next provided the recorded statement to Sgt. Jensen and the DCF worker. The video of the interview was played for the jury, with the exception of the portion excised pursuant

to the court's earlier ruling. In that recorded interview, a ten-year-old A.O. describes being sexually abused by defendant.

¶ 13.    A.O., sixteen years old by the time of trial, testified that when she spent the night at defendant's home, he would tell A.O. where to sleep—usually on a couch in the living room downstairs. Her first recollection of the conduct giving rise to this case took place on that couch in the early morning hours after her aunt left for work; defendant had entered the living room where she was lying face-down on the couch and began rubbing his genitals against her clothed body. A.O. was five years old at the time. Following that experience, she recalled multiple visits when, in the early morning after her aunt left for work, defendant assaulted her, with the abuse escalating over time. She described instances of abuse by defendant taking place in the bathroom, kitchen, and basement of his home. She recalled instances of both oral and vaginal penetration. With respect to the latter, she felt pain, but did not remember any bleeding.

¶ 14.    On cross-examination, defense counsel explored inconsistencies among the statements A.O. made in her initial report, during the pendency of the case, and at trial. A.O. explained that when she was initially interviewed by Sgt. Jensen and the DCF worker at ten years old, she told them everything she could recall. She did not mention at that time that defendant had placed his penis in her mouth because she was unsure of how to say this. She first disclosed the alleged oral assault at a December 2018 deposition in preparation for the trial. Defense counsel asked A.O. why she also did not disclose this to Dr. Patno when she asked her about it during the 2013 examination. A.O. replied that she was frightened. A.O. agreed that she had not come forward with details about other places in defendant's residence where the alleged assaults took place until she met with the prosecutor the weekend before the trial. She indicated that she recalled these details earlier, including during the December 2018 deposition when defense counsel asked her what she might say at trial, but did not disclose them because she was terrified. However, in

6

the last several months, she had come to the conclusion that there was no reason to be frightened anymore.

¶ 15.    Dr. Ballantyne, a psychologist, testified that, based on his review of the literature, a child's delayed report of sexual abuse, or continued association with the alleged abuser, has no bearing on the veracity of their ultimate report.

¶ 16.    During Dr. Patno's testimony, she explained that as a child-abuse pediatrician, she specializes in evaluating children who are suspected victims of abuse to help determine whether abuse occurred.  In the course of these evaluations, she interviews a caretaker of the child, interviews the child, and then physically examines the child.  She explained that she evaluated A.O. in October 2013.

¶ 17.    Dr. Patno testified that her genital examination of A.O. returned "completely normal" results, but that, based on the scientific literature, such a finding is not inconsistent with a child's disclosure of penetration.  This could be so, she explained, for multiple reasons.  First, if the child sustained injuries, those injuries could have healed prior to examination because vaginal tissue heals rapidly.  She examined A.O. about four months after the last incident of abuse was alleged to have occurred, providing "ample time" for any potential injuries to heal and become undetectable.

¶ 18.    She offered a second possible explanation.  A perpetrator could "take their penis and rub it between the labia as opposed to . . . into the vagina."  She went on, "and the reason that perpetrators do that is because—" Defense counsel interrupted with an objection before she could complete this statement.  At a sidebar, the court distinguished between testimony about how perpetrators could penetrate a victim's genital opening without disturbing the hymen and why a perpetrator would do this, ruling that the "how" question was allowed, while the "why" question was not.

¶ 19.    Asked about A.O.'s statements over time, Dr. Patno explained that in forming her opinion, she noted that A.O. "consistently disclosed sexual abuse by [defendant]."  She indicated that the literature supports that "when a child consistently says the same thing, that, in the opinion of child-abuse pediatricians, lends more credibility to their disclosure."

¶ 20.    When the State asked Dr. Patno how A.O. "c[ame] across as a reporter," in answering, Dr. Patno indicated that A.O. "was able to disclose to me that [defendant] had put his 'down there,' which was her term for 'private part,' on her—"  The defense objected, and the court sustained the objection.  Defense counsel then moved for a mistrial on the basis that the court, in its Rule 804a ruling, had prohibited Dr. Patno from testifying about what A.O. told her.  The court denied the motion for a mistrial but instructed the jury to disregard Dr. Patno's statement about what A.O. said to her.

¶ 21.    On redirect examination, the prosecutor began asking Dr. Patno whether any of the information she reviewed suggested that there was any violence toward A.O.; Dr. Patno said no.  The prosecutor then asked, "And what does the scientific literature say with regard to individuals who repeatedly abuse a victim?"  She responded, "So when—when a perpetrator chooses a victim that they're going to repeatedly abuse, they do it in such a way that there isn't injury."

¶ 22.    Defendant objected.  The prosecutor responded that the State had not raised the issue, but it "came up on cross," making it a relevant line of questioning.  Defendant reiterated his objection that Dr. Patno's testimony on this point was not based on science, but instead on interviews with perpetrators.  The State then ceased questioning Dr. Patno.

¶ 23.    Defendant did not call any witnesses.  Following argument, the jury returned a verdict of guilty on both charges.

¶ 24.    Defendant filed a motion seeking a new trial in which he reiterated his argument that a mistrial should be granted because of the hearsay statement which came in through Dr.

Patno. The court denied the motion, finding that defendant failed to establish prejudice arising from the ruling. Defendant now brings the instant appeal.

¶ 25. We begin by considering defendant's challenge to the trial court's denial of his request for a mistrial. Because we find no error there, we proceed to consider his two evidentiary challenges and, finally, his cumulative-error argument.

## I. Motion for Mistrial

¶ 26. Defendant first argues that the court erred in denying his motion for a mistrial, which was based upon Dr. Patno's testimony about what A.O. told her during her 2013 examination, in contravention of the court's Rule 804a ruling. Following a bench conference, the court instructed the jury to disregard Dr. Patno's testimony about what A.O. told her. Defendant contends that the repetition of A.O.'s statement by an expert witness operated to deny him a fair trial.

¶ 27. Criminal courts may grant a defendant's motion for a mistrial where "required in the interests of justice." V.R.Cr.P. 33. This decision "is normally entrusted to the discretion of the trial court," State v. Kandzior, 2020 VT 37, ¶ 12, __ Vt. __, 236 A.3d 181 (quotation omitted), which is best situated "to assess whether any comment, in the context of the trial before it, is prejudicial enough to warrant a new trial," State v. Desautels, 2006 VT 84, ¶ 11, 180 Vt. 189, 908 A.2d 463. Thus, on appeal, we find error in a ruling denying a mistrial "only where the trial court's discretion was either totally withheld, or exercised on clearly untenable or unreasonable grounds." Id. ¶ 18 (quotation omitted). And such error is only reversible if it "appear[s] affirmatively that [the] denial of the motion has resulted in prejudice to the moving party, with the burden of proof being on the movant." State v. Covell, 142 Vt. 197, 199, 453 A.2d 1118, 1119 (1982). This assessment "depends on the facts and circumstances of each case," and we therefore "review the denial of the motion within the context of the entire proceedings." State v. Gemler, 2004 VT 3, ¶ 16, 176 Vt. 257, 844 A.2d 757. Here, considering the statement in the context of the entire trial,

we find neither abuse of discretion nor prejudice arising from the court's decision to deny defendant's motion for a mistrial. Several considerations support this conclusion.

¶ 28. First, the trial court swiftly and unequivocally instructed the jury to disregard Dr. Patno's statement about what A.O. told her. Absent compelling indication to the contrary, we must presume that juries heed the instructions given to them by the court. State v. Sarkisian-Kennedy, 2020 VT 6, ¶ 36, 211 Vt. 390, 227 A.3d 1007 (explaining that courts may abandon this presumption only in face of overwhelming probability that jury will be unable to follow court's instructions and strong likelihood that effect of evidence would be devastating to defendant). The statement at issue here was both limited and cumulative in nature—A.O., her mother, and her mother's partner all permissibly testified about the substance of A.O.'s initial disclosure under the court's Rule 804a ruling. Dr. Patno's brief and incomplete statement was thus not likely to be devastating to defendant and did not give rise to an overwhelming probability that the jury would be unable to follow the court's curative instruction. See id. We therefore assume that the jury followed the court's instruction. See State v. Messier, 2005 VT 98, ¶ 21, 178 Vt. 412, 885 A.2d 1193 (affirming decision to deny mistrial based on witness statement where court "responded with an immediate curative instruction directing the jury to disregard" statement); State v. Potter, 148 Vt. 53, 58, 529 A.2d 163, 166 (1987) (explaining that where improper testimony is given, "a prompt, strongly worded admonition to the jury can eliminate the need for a mistrial in certain cases").

¶ 29. Defendant is correct in observing that testimony may become more impactful where "repeated second-hand before a jury by some person whose own credibility is high," such as an expert witness. State v. LaRose, 137 Vt. 531, 532, 408 A.2d 651, 652 (1979). And Dr. Patno had indicated that the consistency of a child's report is an important consideration in determining what may have happened. However, here, defendant had an opportunity to mitigate the impact of Dr. Patno's brief statement because A.O. herself was available for cross-examination, lessening the

10

risk of prejudice. See id. (recognizing that while hearsay testimony should not be repeated by an expert witness, "[t]here may be times when this transmutation may be allowed to stand where . . . the original witness does take the stand and is available for cross-examination").

¶ 30. The record does not support an inference that Dr. Patno's statement was the result of bad faith on the part of the prosecution. See Gemler, 2004 VT 3, ¶¶ 15, 17 (affirming trial court decision that statement did not rise to level requiring mistrial where statement was "fairly foundational," "inadvertent and not elicited in bad faith"). The prosecutor asked Dr. Patno how A.O. "came across" as a reporter, not what the substance of A.O.'s report was. See Desautels, 2006 VT 84, ¶ 11 (querying whether remark "deliberately elicited" or "repeated by the state's attorney" in evaluating whether it was "obviously intended to prejudice the jury"). Thus, the question was clearly directed at A.O.'s demeanor, a topic on which Dr. Patno could permissibly opine. We do not take the question as an invitation for Dr. Patno to repeat the substance of A.O.'s report in a nonresponsive answer.

¶ 31. Ultimately, the prejudicial impact of an incriminating hearsay statement is gauged by comparing its probative force with the admissible evidence supporting the verdict. State v. Gundlah, 166 Vt. 518, 523, 702 A.2d 52, 55 (1997). This case was not one where "the State's case was so weak that the weight of the [objected-to] testimony was obviously controlling." State v. Pettitt, 2014 VT 98, ¶¶ 7-8, 197 Vt. 403, 104 A.3d 85 (finding no abuse of discretion in court's decision that degree of prejudice in nonresponsive testimony insufficient to require mistrial). And the brief and incomplete statement at issue here falls far short of "the type of 'powerfully incriminating' evidence that requires reversal, particularly in light of the court's immediate curative instruction and the substantial evidence presented by the State" on the same point. Gundlah, 166 Vt. at 524, 702 A.2d at 55 (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)); see also State v. Gallagher, 150 Vt. 341, 349, 554 A.2d 221, 226 (1988) (finding that physician's hearsay testimony about child's report of perpetrator of sexual assault was error, but "in view of

11

the merely cumulative nature of the physician's testimony, and the fact that the child declarant was available for cross-examination, the resulting error was harmless"). There was no abuse of discretion in the trial court's decision to deny the motion for a mistrial.

## II. Evidentiary Challenges

¶ 32. Defendant raises two evidentiary challenges on appeal. We apply a deferential standard of review to a trial court's evidentiary rulings. Sarkisian-Kennedy, 2020 VT 6, ¶ 22. Absent a showing that the court abused or withheld its discretion, we will not disturb a court's reasonable rulings "even if another court might have reached a different conclusion." Id. (quotation omitted). "In the event of error, we may nevertheless uphold a conviction if we find that the error was harmless beyond a reasonable doubt." State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81 (quotation omitted). Both evidentiary challenges at issue here turn on the application of Vermont Rule of Evidence 403, pursuant to which a court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." V.R.E. 403. "Balancing these factors is a matter for the trial court's discretion, and we will ordinarily uphold its rulings." Herring, 2010 VT 106, ¶ 4.

### A. Profile Evidence

¶ 33. We first take up defendant's argument that Dr. Patno's testimony about "what sex offenders do" in order to continue perpetrating against their victims was inadmissible because it was both scientifically unsupported and unduly prejudicial "profile evidence" leading the jury to believe that defendant's actions were those of a typical perpetrator.

¶ 34. The State takes the position that, at the motion in limine hearing the day before trial, defense counsel "explicit[ly] aquiesce[d]" to Dr. Patno's testimony on this point. We cannot agree. Defense counsel apparently left the motion in limine hearing with the impression that Dr.

12

Patno did not intend to testify to the opinion he had objected to, while the State alleges it understood defense counsel to have indicated that he had no objection to any of the proffered testimony, despite all of his previous statements. At best, the record supports that this differing view arose from a misunderstanding on the part of the prosecution. However, if this confusion was strategic, it must be cautioned that prosecutorial overzealousness is to be avoided. See State v. Lawton, 164 Vt. 179, 182, 667 A.2d 50, 54 (1995) (noting that prosecutors are entrusted with obtaining convictions "earnestly and vigorously through legitimate means and methods," and have "corresponding duty to refrain from improper methods calculated to produce a wrongful conviction and to guard against conduct unintentionally trespassing the bounds of propriety" (quotations omitted)). But because the evidence does not support a finding that Dr. Patno's statement was inadmissible either as scientifically unsupported or as profile evidence, this irregularity provides no basis to overturn defendant's convictions.

¶ 35.    "Profile or syndrome evidence is evidence elicited from an expert that a person is a member of a class of persons who share a common physical, emotional, or mental condition." State v. Percy, 146 Vt. 475, 483, 507 A.2d 955, 960 (1986). It is "typically admitted . . . to assist the jury in understanding 'superficially bizarre behavior' of a putative victim." State v. Gokey, 154 Vt. 129, 133, 574 A.2d 766, 768 (1990) ("In these situations, the expert's testimony may be useful to dispel misconceptions about the behavior of victims of certain crimes and to show that the conduct of the complaining witness, however seemingly unusual, is consistent with the profile."). "The function of the testimony is thus primarily rehabilitative, where behaviors such as delay in reporting, recantation, or a continued relationship with the alleged abuser may be mistaken as impeaching the credibility of the child." Id. at 133-34, 574 A.2d at 768. Dr. Ballantyne's testimony about delayed reports is an example of a permissible type of profile evidence. However, courts "overwhelmingly disapprove[]" the use of such evidence "by the prosecution to show that the defendant or the defendant's behavior matched a profile typical of such offenders." State v.

13

LaBounty, 168 Vt. 129, 141, 716 A.2d 1, 9 (1998) (noting that undue prejudice arises from admission of such evidence "to prove defendant's guilt by statistical probability or by association with other defendants").

¶ 36. Dr. Patno's testimony, however, was not profile evidence. Its purpose was not to show that defendant was a member of a class of persons—namely, perpetrators of child sexual abuse. Rather, it was intended to support one of two possible explanations as to how A.O.'s disclosure could be reconciled with the lack of physical findings of abuse in her exam. See United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000) (acknowledging "fine line between potentially improper profile evidence and acceptable specialized testimony explaining the significance of physical evidence"). Moreover, as other courts have explained, the "profile evidence" label is generally unhelpful in distinguishing admissible and inadmissible expert testimony. United States v. Long, 328 F.3d 655, 666 (D.C. Cir. 2003). Instead, courts focus on the governing evidentiary rules and "the purpose for which the evidence is offered: whether it is designed improperly to illuminate the defendant's character or propensity to engage in criminal activity, or whether instead it seeks to aid the jury in understanding a pattern of behavior beyond its ken." Id. "Thus, experts may testify regarding the modus operandi of a certain category of criminals where those criminals' behavior is not ordinarily familiar to the average layperson." Id.

¶ 37. Here, Dr. Patno herself testified that a finding of no physical evidence of abuse on the exam did not militate in favor of a conclusion on the veracity of A.O.'s report either way. Rather, the challenged testimony served to explain the possible significance of physical evidence—the "normal" exam—which was beyond the ken of a layperson. The challenged evidence was admissible to help the jury understand that the modus operandi of perpetrators of child sexual abuse potentially correlated to the exam results.

¶ 38. Defendant also asserts that the evidence was inadmissible because it was "not validated by any empirical studies about what typical offenders do." However, the Rules of

14

Evidence do not require an expert's opinion testimony to be validated by empirical studies. See V.R.E. 702. Instead, expert testimony is admissible where it is (1) based on sufficient "facts or data," (2) "the product of reliable principles and methods," and (3) "the witness has applied these principles and methods reliably to the facts of the case." Id. Under a similar set of facts in Long, the D.C. Circuit rejected the defendant's argument that "the Rule 403 balance tilts in his favor because the probative value of the expert testimony was undermined by [the] failure to include any statistical analysis . . . to indicate the prevalence of the various behavioral patterns and characteristics among preferential sex offenders . . . because expert testimony need not be based on statistical analysis in order to be probative." Long, 328 F.3d at 669 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)); see also Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1297 (8th Cir. 1997) (explaining that some social-science "research, theories and opinions cannot have the exactness of hard science methodologies"). Had the court reached the issue, Dr. Patno's testimony would have been sufficient to establish the admissibility of her opinion under Rule 702. Further concerns about the studies' empirical validity were fodder for cross-examination, but not a barrier to Dr. Patno's testimony on the subject. See 985 Assocs., Ltd. v. Daewoo Elec. Am., Inc., 2008 VT 14, ¶ 16, 183 Vt. 208, 945 A.2d 381 (holding that so long as expert testimony satisfies threshold reliability inquiry, courts must "allow[] the adversarial process to draw out any deficiencies in the expert testimony, rather than usurping the jury's function" by excluding it).

¶ 39. In short, although the State should not have attempted to introduce this evidence following Dr. Patno's representation that it would not be offered, any resulting irregularity was harmless here beyond a reasonable doubt because the evidence at issue was admissible regardless. See V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

15

## B. Video Evidence

¶ 40.    Finally, defendant argues that the court erred in allowing the video of A.O.'s interview with Sgt. Jensen and the DCF worker to be played for the jury despite his argument that it was unfairly prejudicial under Rule 403.  He contends that the court did not "squarely rule" on his challenge to this evidence, and that this constituted a failure to exercise discretion requiring reversal.  However, the lack of a specific ruling on this issue is directly traceable to defendant's failure to squarely present a prejudice argument in connection with his challenge below.  Indeed, his argument remains opaque on appeal.  It appears to amount to an assertion that it was unfairly prejudicial to present video evidence of the interview A.O. gave at ten years old because she was sixteen when she testified at trial.  The substance of the claimed prejudice is not explained.

¶ 41.    We do not require trial courts to "specify the precise weight" accorded to each factor in the Rule 403 balancing test.  State v. Shippee, 2003 VT 106, ¶ 14, 176 Vt. 542, 839 A.2d 566 (mem.); State v. Onorato, 171 Vt. 577, 579, 762 A.2d 858, 860 (2000) (mem.) (affirming Rule 403 balancing and noting "[a]lthough the trial court provided little amplification of the reasons for its decision, it is not required to state precisely why it found probative value to be substantially outweighed by prejudicial effect").  However, "especially in cases . . . where the potential for unfair prejudice is high," "there must be some indication . . . that the court actually engaged in the balancing test and exercised its discretion under V.R.E. 403."  Shippee, 2003 VT 106, ¶ 14.  Defendant contends there is no such indication here.  We agree, but find no error because his argument below, nakedly asserting prejudice without explanation, offered no ground on which the court could exercise that discretion.

¶ 42.    Evidence is unfairly prejudicial to a criminal defendant when its primary purpose is "to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case."  State v. Brillon, 2010 VT 25, ¶ 16, 187 Vt.

16

557, 995 A.2d 557 (quotation omitted). Certain categories of evidence, such as introduction of prior bad acts to suggest a propensity for criminal behavior, necessarily carry a high risk of unfair prejudice. Id. But the evidence at issue here does not fall into one of these categories. See Gallagher, 150 Vt. at 348, 554 A.2d at 225 (concluding that admission of hearsay testimony about child's statements under Rule 804a in addition to child's direct statements was not "unduly prejudicial" to defendant under Rule 403 by virtue of repetition because Rule 804a contemplates that both will be admitted); Reporter's Notes, V.R.E. 804a (explaining rule "evinces a strong legislative intention to safeguard the right of confrontation while at the same time curing the frequent problem of lack of corroboration caused by the traditional hearsay rules").

¶ 43. Assuming that defendant refers to the fact that the jury might find the testimony of a ten-year-old describing being sexually assaulted more sympathetic than a sixteen-year-old describing the same event taking place when she was ten, it is unclear why this circumstance would be unfairly prejudicial to defendant. It is an "established proposition" in the case that defendant is charged with sexually assaulting a child between the ages of five and ten, not a sixteen-year-old. See Brillon, 2010 VT 25, ¶ 16. The fact that six years passed between her initial, recorded statement to law enforcement and this trial cannot itself make it unfairly prejudicial to introduce that initial statement. And it was not incumbent on the court to speculate as to potential sources of unfair prejudice when none were offered. Because defendant proffered no argument upon which the court could exercise discretion under Rule 403, we find no error in the admission of A.O.'s recorded statement.

### III. Cumulative Impact

¶ 44. Finally, defendant argues that even if we conclude that no one argument supports a finding of reversible error, the cumulative impact of all alleged errors on the trial warrants reversal. Specifically, he contends that the court (1) "overlooked Dr. Patno's testimony to inadmissible and highly prejudicial hearsay"; (2) "allowed Dr. Patno to tell the jury that [defendant's] method of

17

offending was typical of sexual predators"; and (3) "allowed the highly prejudicial forensic interview video to be played, despite its low probative value" and even though the video "was unnecessary in the face of live testimony from sixteen-year-old [A.O.]." In defendant's view, the aggregate impact of these circumstances denied him a fair trial.

¶ 45. As we have explained, however, the court did not "overlook" Dr. Patno's hearsay statement, but instead instructed the jury to disregard it; because we presume the jury followed this instruction and because the brief statement was cumulative, no prejudice arose therefrom. And Dr. Patno did not opine that defendant utilized a method of offending typical of sexual predators, but instead testified that the physical evidence adduced through A.O.'s examination could be consistent with A.O.'s report that defendant penetrated her—either because any injury could have healed prior to the examination or because defendant could have sought to avoid injuring A.O., consistent with a modus operandi reflected in the literature relied upon in her field. Because this evidence was admissible, the fact that the testimony exceeded the scope agreed upon among the parties did not give rise to prejudice. Finally, defendant failed to articulate any basis on which the interview video was "highly prejudicial," and this Court has already considered and rejected the suggestion that the admission of such evidence where the witness testifies is cumulative, holding that the Legislature, in passing Rule 804a, intended for both "the out-of-court statements of the child declarant, as well as the child's direct testimony" to be admitted in order to "cure the frequent problem of lack of corroboration caused by the traditional hearsay rules." Gallagher, 150 Vt. at 348-49, 554 A.2d at 226 (quotation omitted).

¶ 46. "The court may grant a new trial if it believes that the cumulative effect of numerous concerns, no one of which can be characterized as reversible error, amounted to a miscarriage of justice." State v. Aiken, 2004 VT 96, ¶ 9, 177 Vt. 566, 862 A.2d 285 (mem.). However, because we have determined no prejudice resulted from any of the circumstances identified by defendant, there can be no resulting cumulative prejudicial effect. See, e.g.,

18

Desautels, 2006 VT 84, ¶ 29 (declining to reverse defendant's convictions under cumulative-error theory because "[a]s we have not identified any prejudicial errors above, there is no basis for such a conclusion"); State v. Billado, 141 Vt. 175, 184, 446 A.2d 778, 783 (1982) (holding that because "no prejudice resulted from any of the instances of alleged misconduct, there could not have been a cumulative prejudicial effect"). For the reasons set forth above, there was no miscarriage of justice here.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 47. **ROBINSON, J., dissenting.** If Dr. Patno had merely testified that one explanation for the absence of any physical evidence of penetration despite A.O.'s report that defendant penetrated her was that it is not uncommon for a perpetrator to rub his penis against the victim's labia majora without vaginal penetration, then I would agree that the testimony was admissible. In fact, in the motion-in-limine hearing the day before trial, defendant, through counsel, expressly agreed that such testimony would be admissible.

¶ 48. But that is not the testimony defendant challenges on appeal. The critical exchange giving rise to this appeal occurred during the State's redirect of Dr. Patno:

> PROSECUTOR: Okay. But is there any information in this case that you've reviewed in preparing your opinions today, that suggest that there was any violence toward A.O.?
>
> DR. PATNO: No. There—no, there was no indication that anything that happened was violent.
>
> PROSECUTOR: And what does the scientific literature say with regard to individuals who repeatedly abuse a victim?

19

> DR. PATNO: So when—when a perpetrator chooses a victim that they're going to repeatedly abuse, they do it in such a way that there isn't injury.

In other words—sexual predators who plan to repeatedly abuse a victim use the technique implicitly ascribed to defendant, and the absence of any injury here suggests that defendant is a sexual predator.

¶ 49. The testimony solicited by the State and admitted at trial is exactly the testimony to which defendant had repeatedly objected, and went well beyond the State's proffer at the motion-in-limine hearing.* Because of this bait-and-switch, neither the trial court nor this Court is in a position to evaluate defendant's challenge to the admissibility of this expert testimony pursuant to Vermont Rule of Evidence 702. I cannot conclude that the error in this case was harmless beyond a reasonable doubt.

¶ 50. Defendant could not have been clearer in the hearing on the motion in limine that he did not object to Dr. Patno explaining how a child could perceive that a defendant had penetrated her even if he did not cause physical injury, but emphasized that he <u>did</u> object to Dr. Patno testifying that sexually assaulting a child without vaginal penetration is, in the trial court's words, "an MO [modus operandi]" for people who abuse children. Defendant argued that such testimony was unsupported by the scientific literature and outside of Dr. Patno's expertise. At the court's suggestion, Dr. Patno herself testified at the hearing on the motion in limine in order to clarify the scope of her intended testimony. That testimony ended with the following exchange between defense counsel and Dr. Patno:

> DR. PATNO: You know, in this case the child disclosed penetration. And my role is to say why her exam is normal, and to educate the jury as to what penetration means, and what are the— you know, it's not just all or none. There are varying degrees of penetration, there are varying types of penetration. A sexual act is to find this penetration of the vulva. The vulva consists of the labia

---

\* My analysis turns less on whether the State's Attorney's conduct here was negligent or intentional, and more on whether it resulted in an unfair process for defendant.

majora and the labia minora and all of those external structures. Penetration doesn't imply that there has to be penile-vaginal intercourse. And I think that's the rule that I, as the child-abuse expert, play in this case. The child's young. Her perception of—of—of penetration is unclear what her—what her understanding of that is. And we know from the literature that children don't really understand what penetration is, but they use—they don't even use the term penetration. They say he put it in me. And we know—and I just gave you—I just shared an article with you. We know that they have different levels of understanding what that means to them.

DEFENSE COUNSEL: And I think—Judge, I think all that's fair game. That's—

DR. PATNO: Well, that's what I'm going to testify to.

DEFENSE COUNSEL: Well, if that's what she's going to testify to, then I don't think we have any problems.

THE COURT: That's certainly what I was thinking. But it's important to make sure so we don't get bogged down in the middle of a jury trial, that then we have to stop and unwind depositions and things like that. So at this point, if she testifies in a consistent fashion in what she just talked about, no objection, at least—

DEFENSE COUNSEL: Correct, Judge.

THE COURT: —conceptually in your motion in limine.

PROSECUTOR: And I see nothing in the disclosure that we sent out in March that's at odds to what she just said.

THE COURT: Yeah.

DEFENSE COUNSEL: Well, I do, but I don't see any problem with what she just said right there—

THE COURT: All right.

DEFENSE COUNSEL: — about what her role would be.

THE COURT: We got it. All right. So at this point, the testimony is going to come in. The motion in limine at this point hasn't identified an objectionable statement from this witness. Fair enough?

DEFENSE COUNSEL: Fair enough.

¶ 51. Because the State's expert indicated that she would limit the scope of her testimony as set forth above, defendant essentially withdrew his objection. He did not cross-examine Dr. Patno as to the basis for her opinion that "when a perpetrator chooses a victim that they're going to repeatedly abuse, they do it in such a way that there isn't injury," because Dr. Patno did not include that opinion in summarizing the scope of her testimony. The trial court did not rule on defendant's motion in limine because, based on the State's proffer, there was no objection to rule on.

¶ 52. Given this record, I cannot evaluate whether the challenged trial testimony was admissible as a matter of law because there is no record on this question to evaluate. I agree with the majority that Dr. Patno offered ample basis in the hearing on the motion in limine to support her testimony describing the distinction between vulvar penetration and vaginal penetration, and explaining why some children do not understand this distinction. But in the face of defendant's objection pursuant to Rule 702, the State bore the burden of establishing that Dr. Patno's challenged opinion was based on sufficient facts or data. See State v. Sarkisian-Kennedy, 2020 VT 6, ¶¶ 23, 24, 30, 211 Vt. 390, 227 A.3d 1007 (explaining that court serves as gatekeeper screening expert testimony to ensure that it is reliable, that "reliability is assured if the evidence is supported by 'scientific knowledge,' " and that proponent of expert evidence bears burden of proof and persuasion under Rule 702 (quotation omitted)). On this record, I cannot conclude that the trial testimony challenged on appeal—jumping from describing child victims' experiences to ascribing strategies and tactics to serial sexual abusers—was admissible as a matter of law or even admissible at all. That evidentiary void, in this case invited by the State itself, operates against the admissibility of the testimony.

¶ 53. And I cannot agree that the admission of this objected-to testimony was harmless beyond a reasonable doubt. See State v. Tester, 2009 VT 3, ¶ 45, 185 Vt. 241, 968 A.2d 895 ("Our standard for harmless error is the same whether the error is constitutional or not—the error must

be harmless beyond a reasonable doubt."). Even when supported by some scientific basis, the admission of this kind of evidence requires particular caution. As this Court has explained in cases where the prosecution has succeeded in offering evidence that the defendant or the defendant's behavior matched a profile typical of a class of offenders, appellate courts have overwhelmingly disapproved the use of such evidence. See, e.g., State v. LaBounty, 168 Vt. 129, 141, 716 A.2d 1, 9 (1998). In LaBounty, we cited with approval an appellate decision from Washington State reversing a defendant's conviction where the trial court had allowed an expert testifying for the State to describe the strategies typically used by sexual abusers to "groom" their intended victims. Id. (citing State v. Braham, 841 P.2d 785, 787 (Wash. Ct. App. 1992)).

¶ 54.    I do not suggest that such testimony is never admissible, but the absence of evidence as to the scientific basis for Dr. Patno's opinion on this point is particularly concerning, given the nature of the testimony. It's one thing for the State to address the absence of physical evidence by pointing to scientific evidence that a sexual assault without actual vaginal penetration is not uncommon; it's quite another to suggest that the absence of physical injury is further evidence that defendant is a sexual predator. Given that this case turns almost entirely on the testimony of the complaining witness, I cannot conclude that the court's admission of the inadmissible evidence was harmless beyond a reasonable doubt.

¶ 55.    For these reasons, I respectfully dissent.

_____
Associate Justice